# DAGGETT *v.* KAUFMANN.

PATENTS; INTERFERENCE; BURDEN OF PROOF; EVIDENCE; REDUCTION TO PRACTICE; ABANDONED EXPERIMENT; DILIGENCE.

1. The junior applicant in an interference, who was the first to conceive, must show affirmatively actual reduction to practice in order not to lose the benefit of his earlier conception where he was lacking in diligence at the time of the filing of his adversary's application and constructive reduction to practice.

2. Unanimity of decision on the part of the tribunals of the Patent Office increases the burden of proof upon the junior party to an interference, and, in order to obtain a reversal on an appeal by him, error must be made clearly to appear.

3. In an interference case involving an improvement in mantles for incandescent lights of the inverted type, in which the junior applicant, who was the first to conceive, claimed that the device was so simple and its efficacy so obvious that the making by him of one of the required description constituted an actual reduction to practice without its test on the inverted lamp then in use, it was *held* that an actual test was necessary to have that effect, in view of the evidence, which showed, among other things, the construction by such party of a number of mantles, and frequent experimentation therewith in the office of a factory engaged in the manufacture of mantles, and that there were difficulties to be overcome by reversing the direction of the mantle and the consequent change in the shape of the lamp.

4. A decision of the Commissioner of Patents in an interference case involving an improvement in mantles for incandescent lights of the inverted type, adverse to the junior applicant, upon whom was the burden of proving actual reduction to practice, on the ground that tests made by the applicant showed nothing more than an abandoned experiment, was *affirmed*, where the evidence showed, among other things, that the application had been assigned to a manufacturing company engaged in the manufacture of mantles; that the applicant was an em-

ployee of that company; that the testimony in support of that of the applicant was given by employees and officers of the company; and, while unimpeached, was vague in regard to the tests made, the witnesses contenting themselves with saying that the experiments were satisfactory, and omitting details; that none of the expert mantle makers employed in the factory were called to testify, and that the company took no steps to exploit the alleged invention for about two years, during which time experiments were conducted by the applicant to render commercially available mantles of the inverted type.

5. While, if an invention which is the subject of an interference has been actually reduced to practice, the inventor will not be deprived of the benefit of his invention by reason of mere delay, without intention to secrete or suppress it, or by the exploitation of a preferred substitute (following *Esty* v. *Newton,* 14 App. D. C. 50), yet, long delay in making use of the invention, or in applying for a patent, are potent circumstances tending to show that an alleged reduction to practice was nothing more than an abandoned experiment (following *Paul* v. Hess, 24 App. D. C. 462).

No. 572.   Patent appeals.   Submitted May 15, 1909.   Decided June 1, 1909.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.                     *Affirmed.*

The facts are stated in the opinion.

*Mr. A. B. Stoughton* and *Messrs. Bakewell & Byrnes* for the appellant.

*Mr. Joseph L. Levy* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

This is an interference between rival applicants for an improvement in mantles for incandescent lights of the inverted type.   The issue is defined as follows:

"1. An inverted mantle having a cylindrical open top and a dome-formed smooth surface base consisting of two sections,

each of the general form of a quarter of a sphere, and seamed together at their edges.

"2. An incandescent mantle constructed from a tubular stocking having a cylindrical open end and a smooth dome-shaped closed end formed of curved end sections, and united at their edges by means of seams."

Otto Kaufmann's application was filed October 21, 1905; Herbert M. Daggett, Jr.'s, on December 6, 1905.

In the earlier and best known type of the gas incandescent lamp the flame is directed upwards, aand is slender and of considerable length. The mantle to be made incandescent is conformed to the shape of the flame to the extent necessary to secure sufficiently uniform heating. The knitted fabric forming the base of the mantle is in the form of a cylinder or sleeve and is gathered or shirred at the upper end, by which it is secured to its support. It is not entirely closed, and presents a puckered appearance. The inverted lamp for which the mantle of the issue is intended was first used in Europe. The tendency of gas being upward, the flame when turned downward spreads out and takes a shape that has been described as resembling an inverted mushroom. The foreign inverted mantles conformed to this shape of the flame and their ends were closed and fastened in a manner not then apparent to American manufacturers. In the invention of the issue the end of the mantle is closed by a seam and the puckering of the end, as in the former upright mantle, is avoided, and it is given the dome shape which conforms to the shape of the downward flame, permitting heating to be substantially the same temperature throughout.

The disclosure of each party answers the terms of the issues. Daggett unites the end portions of the tubes with a single semi-circular seam, while Kaufmann uses cross-seams uniting four end sections, to form the dome.

Daggett alleged conception, disclosure, and reduction to practice in the spring of 1903. Kaufmann alleged conception, disclosure, and reduction to practice in July, 1903.

Daggett, being the junior applicant, had the burden of proof.

It became necessary for him to show actual reduction to prac-
tice, as claimed, for otherwise he would lose the benefit of an
earlier conception because of want of diligence at the time of
Kaufmann's application and constructive reduction to prac-
tice.

All of the tribunals of the Office concurred in holding that
his testimony failed in the required certainty of reduction to
practice, and established nothing more than an abandoned ex-
periment.    Priority was, therefore, awarded to Kaufmann.
This unanimity of decision increases the burden upon Daggett,
and, in order to obtain a reversal of the decision, error must be
made clearly to appear.

In avoidance of this effect of the concurrent decisions of the
several tribunals of the Patent Office, the appellant contends
that the question of his reduction to practice, under the circum-
stances of the case, is one of law, simply, in that the making
of a complete mantle that is an embodiment of the issue is
itself a reduction to practice without the aid of trial or ex-
periment, in the light of what was then well known in the art.
In other words, the claim is that the device is so simple and its
efficacy so obvious to those skilled in the art, that the making
of one of the required description is a complete demonstration
of its practical utility and commercial value.    Undoubtedly
there are many simple devices, the construction of which of
operative size and material, has this effect.    It is however a
matter of some doubt, at least, whether appellant, in fact,
produced a mantle in the spring of 1903 so complete in form
and perfect in construction as to amount to a satisfactory
demonstration of its efficacy for the intended use.    In the first
place, the drawings accompanying the application which de-
scribes the construction do not show with perfect certainty the
shape and design of the now successful mantle.    They are
elongated rather than ovoidal, and in two of them, at least, the
seam is apparently curved.    It was not until October 12, 1906,
that figure 6, showing plainly a dome-shaped end with a straight
seam, was added.    In these respects, the drawings are in
marked contrast with the drawings accompanying appellee's

application, notwithstanding they may show conformity with the general terms of the issue. There is also a lack of precision in the testimony, of the witness called to corroborate Daggett, in identifying the particular figure of the drawings to which the earlier construction conformed. But, assuming, for the purposes of the contention, that the evidence clearly shows the construction of a complete mantle answering the general requirements of the issue, as early as the spring of 1903, we cannot agree, from what we now know of the efficacy of the commercial mantle, that it was then so simple a thing as to demonstrate that efficacy without some test. A sufficient test, of course, would be its successful trial upon the inverted lamp then in use.

The fact that the testimony of the inventor tends to show the construction of a number of mantles, and frequent experimentation therewith in the factory of the Welsbach Company, where everyone was familiar with the use of the upright mantle, is a strong indication that the mere construction of the mantle was not a sufficient demonstration of its utility for the purpose intended.

The difficulties to be overcome in the reversal of the direction, and the consequent change in the shape, of the flame from the lamp, suggest the reasonableness of an actual trial to ascertain if the desired result had been obtained.

The earnest and confident contention against the soundness of the conclusions of the tribunals of the Office that the evidence relating to actual reduction to practice, through tests of the efficacy of the earlier constructed mantles, shows nothing more than an abandoned experiment, has induced a very careful examination of all of that evidence. We find that it has been fully reviewed in the several decisions referred to, and fairly stated. It would serve no useful purpose to consume space with another review of the testimony, and we shall content ourselves with some general observations in explanation of our conclusion.

The invention of Daggett belongs to the Welsbach Company,—a corporation apparently of large means, engaged in the manufacture of gas lamps and mantles. The inventor and his

corroboratory witnesses are employees and officers of that corporation, and, to that extent, interested; but there is nothing in their testimony to cause a suspicion of their veracity, or that they have been unduly biased by their relations with the real party in interest. Had they been untruthful or unfair witnesses, they might readily have avoided the objections made to the want of precision in their testimony. On this point it was said by the Commissioner: "While it is not necessary, in order to establish reduction to practice of the invention in issue, to prove that elaborate tests as to the light-giving qualities of the mantles of 1903 were conducted, and that such tests showed that the mantles were, in all respects, highly effective and in an entirely commercial form, something more is necessary than the very general statements of the witnesses, pointed out above." The testimony is vague in regard to the tests, the witnesses contenting themselves with saying that the experiments were satisfactory, and omitting details of the several experiments and the particular results of each. It is to be noted, also, that neither Daggett nor either of the officers of the company, called to corroborate him, was an expert mantle maker, and that none of the expert workers in that line in the factory was called to testify. Again, it is a fact of considerable significance that the Welsbach Company took no steps, in a reasonable time after the alleged satisfactory steps, to exploit the invention. It waited for two years, at least, before moving in the matter of obtaining a patent, and did not commence the manufacture of the mantle for market until July, 1906. But, during this interval, the importance of the inverted mantle as a commercial article had not been overlooked. Daggett had resumed his efforts to discover the secret of the closing of the ends of the imported mantles. He discovered how these ends were shirred, and the Welsbach Company adopted that method, and prosecuted it commercially until July, 1906. It is true that, if the invention of the issue had been actually reduced to practice, the inventor would not be deprived of the benefit of his invention by reason of mere delay, without intention to secrete or suppress it, and by the exploitation of a preferred substitute. *Esty* v.

*Newton,* 14 App. D. C. 50, 54. But, in all such cases, "long delay in making use of an invention claimed to have been reduced to practice, or in applying for a patent, have always been regarded as potent circumstances tending to show that the alleged reduction to practice was nothing more than an unsatisfactory or abandoned experiment." *Paul* v. *Hess,* 24 App. D. C. 462, 468; and cases cited.

Considering all of the circumstances mentioned, in connection with the direct evidence of the witnesses, we are not convinced that there was error in the decision of the Patent Office tribunals. In accordance with a settled rule, without such conviction we cannot reverse those decisions.

This renders it unnecessary to determine the exact date of Kaufmann's conception and reduction to practice. His company commenced manufacturing the mantles of the issue in October, 1905, and, on the 21st day of that month, he filed an application completely and accurately disclosing the invention. This entitles him to priority over a rival who may have conceived the invention earlier, but was not exercising diligence when he entered the field.

The decision in favor of Kaufmann will be affirmed; and the clerk will certify this decision to the Commissioner of Patents, as the statute directs.          *Affirmed.*