26 C.C.P.A.(Patents)

COLLINS v. OLSEN.*

Patent Appeals No. 4069.

Court of Customs and Patent Appeals.
March 6, 1939.

*Rehearing denied May 1, 1939.

Watson, Bristol, Johnson & Leavenworth, of New York City (Charles M. Thomas and James A. Hoffman, both of Washington, D. C., and Clair V. Johnson, of New York City, of counsel), for appellant.

Ralph H. Hudson and William B. Kerkam, both of Washington, D. C., for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

BLAND, Associate Judge.

This is an appeal in a United States Patent Office interference proceeding which involves the application of William R. Collins, filed December 3, 1928, and assigned to Standard Brands, Inc., and an application of Aksel G. Olsen filed December 3, 1929, and assigned to General Foods Corporation.

Standard Brands, Inc., through its subsidiary, Royal Baking Powder Co., manufactures and distributes "Royal Quick Setting Gelatin Dessert," while the Jell-O Company, a subsidiary of General Foods Corporation, produces and sells a gelatine product known as "Jell-O."

Both parties took testimony, and the appellee, being the junior party, was required to prove by a preponderance of the evidence his priority of invention in the sole count in issue which had been suggested by the Primary Examiner and which reads as follows: "In a jelly composition the combination of an edible mixture of sugar, gelatine and acid with a buffer salt comprising a salt of a strong base and a weak acid."

Concerning the invention involved and the state of the art existing at the time the parties made their respective inventions, the record discloses that prior to the invention here involved gelatine food mixtures dissolved in water and set in molds had been used for at least half a century. Prior to this invention, the commercial mixtures consisted of sugar, tartaric or citric acid, gelatine, flavor and color. This kind of mixture would usually set under ordinary conditions in three or four hours dependent upon the method used for cooling. When both parties entered the field and long prior thereto, the food industry was demanding a preparation which would set in a shorter period of time. The problem confronting the inventors was how to promote quick setting without injuriously affecting the edibility of the product. Where somewhat quicker setting was desired, greater amounts of gelatine were sometimes used, which often resulted in a tough, leathery product. Moreover, this treatment reduced the desirable acid content and in this way adversely affected the flavor of the mixture.

The invention in the instant case rests in the discovery that if a buffer salt of a strong base and a weak acid was added to a mixture of gelatine, sugar and acid, the mixture would always jell and the jelling action would take place in a much shorter time than possible under old methods, without adversely affecting the texture or flavor of the product. The edible salts used for buffer purposes were such as sodium bi-tartrate, ammonium citrate and certain phosphates. The buffer salt was added for the purpose of bringing about a buffer action in the mixture which action was the prevention of changes in hydrogen-ion concentration of acid or alkaline solutions. See "Chemical Encyclopaedia"—Kingzett, Fourth Edition, page 89.

The Examiner of Interferences awarded Olsen a conception date of at least as early as December 7, 1927, and held that he had constructively reduced the invention to practice by filing his application on December 3, 1929. He awarded to Collins a conception date of at least as early as October 8, 1928, and a date for constructively reducing the invention to practice of December 3, 1928, his application date. He held that since the record discloses that Olsen made no tests which involved ingestion or the consumption by a human being or some animal "whose digestive processes are known to closely parallel those of normal human beings, [etc.]," he had not reduced the invention to practice prior to the conception date awarded to Collins; that Olsen was not diligent from the time Collins entered the field until he filed his application, and that, therefore, since Olsen, being the first to conceive but last to reduce to practice, was lacking in diligence at the critical period, priority of the invention was awarded to Collins. Upon appeal to the Board of Appeals, the board did not review the evidence concerning the tests by Olsen but held that the examiner was in error in holding that said ingestion test was necessary and stated on this phase of the case that: "We believe, therefore, that the Olsen proof upon which the examiner

awarded conception as of November 1, 1927, may be relied upon to establish a reduction to practice. * * * "

From the decision of the board appellant has appealed here and urges first that, irrespective of the necessity of an ingestion test, appellee has produced no corroborative proof of any test being made meeting the requirements of the law; second, that the examiner was correct in requiring that the ingestion test be applied to a food product which contained for the first time the use of a chemical substance, which though previously used in other foods was known to have certain undesirable physiological effects if used in certain quantities and under certain circumstances. Other questions were presented which, in view of our conclusion, we need not state or discuss here.

After carefully examining the record which consists of more than one thousand pages, we are of the opinion that the board was in error in concluding that the Olsen proofs, upon which the examiner awarded conception as of December 1, 1927, could be relied upon to establish a reduction to practice of the invention. In reviewing the record in order to ascertain if Olsen's proofs showed a proper reduction to practice of the invention, without giving consideration to the question involved relating to the ingestion tests, we do not have the advantage of a discussion by either tribunal of the Patent Office of the testimony and the numerous documentary exhibits introduced.

We agree with both tribunals that Olsen was properly awarded a conception date of the invention of the count as early as December 7, 1927, which was nearly two years prior to his constructive reduction to practice on December 3, 1929. Collins' conception date, October 8, 1928, although an earlier one is claimed (which is immaterial, being subsequent to the date properly awarded Olsen) is not seriously questioned by anyone, and the reduction to practice date relied upon by him is his filing date—December 3, 1928. It follows that if Olsen, although first to conceive, did not show a reduction to practice of the invention prior to the date of Collins' conception, or did not show diligence in perfecting the invention from a period just prior to the date when Collins entered the field to the date of reduction to practice, he cannot, upon the instant record, be awarded priority.

Although appellee contends that testing as to setting time was all that was required for the completion of his reduction to practice, it is too clear to require extended discussion that the invention of the count could not be said to have been reduced to practice when the facts relating to setting time alone were ascertained, because the material might set quickly and be inedible. Different proportions of the ingredients had to be tried out. The resulting product could not be said to be edible or to possess utility if its texture was so leathery or its tart flavor so far reduced that it was not satisfactory as a food. We think the record shows that in order to determine its edibility, it had to be tasted for the purpose of determining its texture and flavor. Moreover, since the object of the invention was to reduce the setting time without affecting its taste and edibility, it was very important to test it as to setting time. Without regard to an ingestion test, we think at least four things should have been ascertained by proper tests—first, did the addition of the buffer salts change the taste of the article so as to make it inedible; second, did it reduce the acidity of the preparation so as to destroy the desirable tart taste; third, was the texture of the gelatine substance rendered leathery or otherwise; and, fourth, was the setting time of the gelatine mixture substantially reduced by the addition of the buffer salts.

In order that the Olsen evidence be understood, it is necessary to give a somewhat detailed picture of the background and conditions under which Dr. Olsen worked. He was employed in the Battle Creek, Michigan, laboratories, in the research department of General Foods Corporation. Dr. Fine was Olsen's superior officer and is one of the two witnesses whose testimony is relied upon for corroboration of Olsen's testimony. Mr. Ferguson, the other witness whose testimony is relied upon for corroboration of Olsen's testimony, was chief chemist of the Jell-O Company, located at Le Roy, New York. Much testimony was introduced showing the experiments made by Olsen during a period beginning as early as November 1927, and continuing (except as is hereinafter stated) until the end of 1929. He made out and submitted to Dr. Fine reports showing his experiments with different proportions of the ingredients of the gelatine mixture which included the buffer salts,

which reports also showed the results of said experiments. Dr. Fine, in turn, submitted the reports to the chief chemist, Ferguson, at LeRoy, New York. Some effort is made by appellee to here substantiate the claim that Dr. Fine's testimony corroborates that of Dr. Olsen on the subject of reduction to practice. We will not unnecessarily extend this opinion by detailing all the reports made by Olsen and the subsequent action of Fine with relation thereto, but it is sufficient to say that there is nothing in the record to show that Fine at any time participated with Olsen in making any of the experiments or in doing any of the actual work, although it is disclosed by the testimony that Olsen did show Fine his results and that Fine said that Olsen "frequently demonstrated his experiments" and was generally familiar with the tests made. What was accomplished by the experiments is not stated by Fine. There is nothing to show that these experiments had to do with a substance that would conform to the count, nor is there anything to show that Fine was personally acquainted with what was accomplished by the experiments.

Fine also testified that two samples which had been forwarded by Ferguson to Olsen were tested and that one of these samples had a shorter setting time than the other. He stated this fact from his recollection. Whether he obtained his information from the reports, or from actually seeing the operation and noting the time of setting is not disclosed. Moreover, in testifying on this subject he recalled that a second series was requested, according to his recollection, because the first series, the one which he stated showed a shorter setting time, was not satisfactory—"did not give quite the improvement in setting time that was expected, and Olsen had an explanation for it which was passed on to Ferguson." This is far from proving that Olsen made a satisfactory test which resulted in ascertaining that the new product was satisfactory in respect to the qualities heretofore referred to. The record does not show that Fine at any time in the presence of Olsen or elsewhere ascertained that the experiments of Olsen, while using his formula set out in his reports, resulted in producing such an edible product as is defined by the count. He said: "I have a rather general recollection of these tasting tests. I don't remember whether I participated in the tasting tests or not."

He did not say that he saw Olsen give the material a tasting test, nor did he say anything about the results which he ascertained from any test made by anybody (as distinguished from seeing the reports). Nothing in the record discloses that he gave the material any kind of test nor does the record show that he saw Olsen give the mixture the Bloom test to determine the gelatine content or the pH test to show the effect of the buffer salt on the acidity of the mixture or any test intended to ascertain the texture of the new product.

The record as a whole discloses that Fine was interested in the experiments which Olsen was making. Since Fine, as Olsen's superior, was responsible for Olsen's work, his interest was a natural one. It was Fine's aim through Olsen to solve the problem confronting the industry. He accepted Olsen's reports and his conclusions as to the results and forwarded them to the Jell-O Company for further consideration. These reports when received by Ferguson in New York, the testimony shows, were received with great interest. The value of the claimed improvement (if perfected) was fully appreciated. The record definitely shows that Ferguson was never present in the Battle Creek laboratories when any experiments or tests with reference to the invention were being made. His information concerning what Olsen had done and the tests which Olsen had made in 1927 and 1928 came to him by way of reports submitted by Fine.

Some attempt was made to show that Ferguson applied tests to the product produced in accordance with the reports, experiments and tests made by Olsen. The evidence in this regard chiefly relied upon is in the form of letters and other documents which passed between the parties in the due course of mail, supplemented, in some respects, by the testimony of Ferguson. This is so fragmentary and indefinite that from it we cannot conclude that Olsen's clear conception and definite disclosure was ever fully tested by anyone but Olsen, and the record affords no evidence of anyone satisfactorily verifying the tests which were made by Olsen.

We must conclude that statements in reports by Olsen, no matter how clear, as to what he used, what he did and what the results were, cannot be accepted as proof of reduction to practice, unless fully corroborated, even though such reports were made to an official who had such

confidence in their accuracy that he was willing to act upon them without complete and independent investigation. While they constitute good evidence of conception, they are self-serving on the question of reduction to practice. See Petrie v. De Schweinitz, 19 App.D.C. 386; Sundberg et al. v. Schmitt, 58 App.D.C. 292, 29 F. 2d 880; Fausek et al. v. Vincent, 92 F.2d 909, 25 C.C.P.A., Patents, 770; Janette v. Folds et al., 38 F.2d 361, 17 C.C.P.A., Patents, 879; Rolfe v. Hoffman, 1905 C.D. 356; Daggett v. Kaufmann, 33 App.D.C. 450; and Robinson v. Thresher, 28 App. D.C. 22.

Ferguson testified to a letter he wrote to Fine in 1928 in which he stated: "* * * However, we can confirm your observations with respect to .3 grams sodium citrate and .75 grams sodium phosphate (mixture of mono- and di-salts) as not affecting the taste." Nothing is stated here which definitely establishes what other ingredients were used or the quantities of the same. It may be suggested that since this letter was one probably answering that of Dr. Fine which probably contained one of Olsen's reports, this statement of result which ensued from the tasting by Ferguson was based upon the ingredients and the proportions of the same as reported by Olsen. It is obvious that this statement and certain other statements are not sufficient in themselves to warrant the conclusion that Olsen has proved by corroborating witnesses that proper and satisfactory tests of the mixture were made and this is especially true in view of considerations to which we will later herein advert. Ferguson stated that he had no other record of the tests except that letter and that the statement relating to taste in the record was based upon tasting tests made by him, and that: "They were made by adding the respective amounts of each of the buffers to Jell-O solution; that is, taking regular Jell-O, dissolving it in water, dividing it into halves and adding the buffer to one-half so that conditions were all identical with the exception of the buffer, and then tasting the two after setting them up."

Nothing was said in the letter or in this part of the testimony with respect to tests being made to ascertain the other essential qualities of the mixture. He later stated that he received a letter from Dr. Fine requesting him to: "Run a batch the usual way and a batch containing per package 0.75 gram of a mixture of equal parts of mono- and di-sodium phosphates. For each batch there will be used the same gelatin blend. From each finished mix will be selected at random, or perhaps rather so selected as to be most truly representative of the entire mix, 12 packages, 6 of which will be sent to us and 6 retained by you."

Pursuant thereto, in February 1928, Ferguson prepared a batch which he called a "pilot plan operation" which he defined as being a halfway step toward factory operation. He weighed in the proper amount of ingredients which were the same as those "used in the regular gelatin formula." He added 0.75 gram per package of buffer salt. He made this batch up into twelve packages. He sent to Dr. Fine six packages marked "R" representing the regular run and six packages marked "S" which contained the phosphate buffer mixture. In connection with transmitting the said twelve packages he stated that "we" had not yet made any setting time determinations but that gelometer readings to determine the gelatine consistency of the batch had been taken. Some reference was made to the Bloom test which is similar to the gelometer test relating to the determination of the gelatine character of the article. The record contains no evidence that Ferguson at any time made a test for setting time or that he saw anyone else make such tests. Evidently he relied entirely upon the tests in this regard which had been made by Olsen. The following is quoted from his testimony:

"Q. 142. At the bottom of page 89, there is a reference which reads, 'Also note relative setting times.' Did you make any setting time determinations on these mixtures? A. No, that was a note I made regarding an experiment which I could not carry out.

"Q. 143. Please refer to the two lines written immediately following the table on page 90 and state what they refer to. A. I was not so much interested in setting times here as in finding out the value in money terms of the phosphate buffer. I was, of course, interested in this phase of the subject and on page 90 I remembered that I did fill some test tubes with each of the above at 11:30. I evidently got hungry and that is the end of that."

The record discloses that Mr. Ferguson had many duties to perform as chief

chemist for the Jell-O Company and he states in substance that during the critical period his work was so great that there was plenty of work for two men. The following question and answer shows the conditions which existed in the Jell-O plant at New York during the critical period: "Q. 151. In connection with the production of Jell-O what were your routine duties? A. We had to keep a close control on the gelatin both as to testing reference standards upon which purchases were continually being made, and then we had to check up the deliveries against the reference standards. During this time we were quite often involved in differences of opinion between ourselves and gelatin manufacturers as to the deliveries, and this took considerable time. Then, in connection with Jell-O, there was the close control of the quality of the tartaric acid and the raw materials for the colors and the flavors; also under my supervision was and is the preparation of the vegetable colors used in Jell-O. I think we are the only gelatin dessert firm that makes our own colors. Then we had as other products Jell-O Ice Cream Powder and D-Zerta, a line of cream desserts which, if I remember rightly, had been introduced, and a chocolate pudding powder. There was plenty of work for two men." Other duties and responsibilities were also testified to.

It is sufficient to say that the Ferguson testimony does not disclose that he or anyone under his direction, unless it was Olsen, by his activities which have heretofore been referred to, made any proper and complete tests, in which satisfactory results were obtained, of a mixture such as defined in the count.

Our conclusion that no reduction to practice by Olsen, such as the law requires, is disclosed in the instant record, is confirmed by a consideration of events and circumstances which happened subsequent to the time when Olsen claimed the invention was reduced to practice. Experiments with the mixture continued long after Collins entered the field. Collins' cross-exhibit W, dated Le Roy, New York, April 12, 1929, is a letter, initialed by L. R. Ferguson and addressed to Dr. Fine. In it he states, in substance, that he had been trying to duplicate the results of the experiments that had been reported to him and that he had so far been unsuccessful. He referred to the fact that he had failed to get a decrease in setting time, stated that it might be on account of the kind of water used, inquired as to the temperature at which certain determinations were made, and promised to send Dr. Fine one-half of a new blend and work on the other half himself. In the light of his reference to the different kinds of tests given the product in 1929 it seems strange that the same witness while testifying would not have more definitely described the character of the tests he referred to in his testimony.

It must be further remembered that it was nearly two years after Olsen's conception before any application for a patent was filed. It is contended by appellant that Olsen's assignee never went into production of a product responding to the counts until late 1935. Before the board it was argued by appellant that the doctrine of Mason v. Hepburn, 13 App.D.C. 86, applied to Olsen. Olsen in his brief points out that Ferguson testified that commercial production was started in January 1930. Ferguson stated that the goods which then were sold were prepared for the institution trade. The party Collins has introduced into the record a number of statements made by Olsen's assignee, in the way of advertisements and on Jell-O packages, which suggest that as late as two or three years after Olsen had filed his application the Jell-O Company was not engaged in meeting the competition of other concerns by the advertisement and sale of merchandise produced in accordance with the teachings of the patent application. It was at this late date frequently stated by the Jell-O concern that the secret of their quick-setting gelatine rested in the use of warm water instead of hot water. One of the exhibits introduced by Collins, No. 69, is an article in the December 1932 issue of the "Tide" magazine which contains a release from the publicity department of the General Foods Corporation and states: "For more than a year the quicker-setting boasts of Royal and others went unchallenged. During that year chemists were working in General Foods Laboratories, experimenting with smaller crystals, new processes of manufacture. Last month General Food's Jell-O answered its competitors. * * *"

Other exhibits indicate to some extent, we think, that Olsen's assignee never sufficiently ascertained the good results flowing from Olsen's disclosure to justify its

engaging in a large-scale commercial production of the product defined by the count until competition from appellant's assignee and others required it to do so, which it began in earnest in 1935, after it knew of Collins' accomplishment. (Collins' commercial production started in 1929.)

Now, of course, these acts and circumstances above detailed which occurred subsequent to the filing of the Olsen application would be irrelevant and of no value in event the record disclosed that the appellee had completely reduced his invention to practice as he claims. But it is our view that since the instant record does not show with sufficient clearness that there was a reduction to practice by Olsen such as was required by law until his filing date, the conduct of Olsen and his assignee become important in the consideration of the question. In Bennett v. Fitzgerald, 48 F.2d 917, 920, 18 C.C.P.A., Patents, 1201, where the question of reduction to practice depended upon the demonstration of the practicability of the device involved and was in considerable doubt, this court said: "Of course, if reduction to practice is established, other circumstances or conduct of a party would not warrant us in making a contrary finding; but, if reduction to practice is not clearly established, the facts and circumstances shown by the record may be resorted to for the purpose of determining whether there was in fact a reduction to practice, or whether the alleged reduction to practice was only an abandoned experiment."

The Examiner of Interferences held, and we think correctly, that Olsen was not diligent immediately prior to and upon the date when Collins conceived the invention. The board, having held that Olsen's evidence proving conception also proved reduction to practice, did not pass upon this question. There is no dispute concerning the facts relating to diligence shown by the record. They are concisely stated in detail by the Examiner of Interferences and in summing up he made the following findings: "* * * During the critical period however, Olsen was not diligent, since just prior to October when Collins conceived—, Olsen was either engaged in activities relating to his personal educational attainments, or else was working on some other problem unrelated to the subject matter in issue. This lack of reasonable diligence during the critical period is fatal to Olsen's claim to priority and clearly entitles Collins, as the first to reduce to practice, to the award of priority."

The Examiner of Interferences pointed out that completing his college work by Olsen was not necessary to the completion of his invention and that such work as he did upon his return during the critical period was not upon the invention involved but that all his efforts during any portion of the critical period were in investigating competing brands of gelatine desserts "to determine the influnce of acidity and gelatine contents upon the setting time * * * which was preliminary to later investigations in which buffer salts were added to various gelatine dessert mixtures." The record amply supports the finding of the examiner.

For the reasons hereinbefore stated, we are of the opinion that the board erred in awarding priority to the junior party Olsen, and its decision so doing is reversed and priority of invention in the involved matter is awarded to the senior party Collins.

Reversed.