35 C.C.P.A. (Patents)

## THURSTON v. WULFF et al.

### Patent Appeal No. 5368.

Court of Customs and Patent Appeals.

Nov. 29, 1947.

James Edwin Archer, of Stamford, Conn., for appellant.

Michael L. Looney, of Washington, D. C., for appellees.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

BLAND, Associate Judge.

The sole question involved in the instant appeal from the decision of the Board of Interference Examiners of the United States Patent Office awarding priority of invention of the single count in issue to appellees is whether or not there was, on the part of appellant, Thurston, timely reduction to practice.

There is no serious contention in this case that Thurston was not the first to conceive the invention and there is no claim by anyone that if Thurston did not reduce to practice he was diligent during the critical period.

The count in issue is as follows:

1. y-nitropimelic nitrile.

Testimony was taken by Thurston. Appellees relied upon their filing date—July 26, 1941. Thurston filed his application on December 30, 1941.

In view of our conclusion it will not be necessary to state all the facts disclosed by the record, but we shall set out the salient points thereof which we think necessary to a decision of the case.

y-nitropimelic nitrile is a compound which is sometimes referred to in the record as 3 nitro-1, 5 dicyano petane and may be prepared by reacting acrylonitrile with nitromethane in various solvents.

There is in evidence, as Thurston Exhibit No. 12, a small bottle containing a

sample of the compound which Thurston testified was prepared by him on April 5 and 6, 1939. The importance and significance of this exhibit will be commented upon later. The sample is a white, powdery, crystalline substance, having somewhat the appearance of salt.

Thurston has adduced the testimony of seven witnesses, all of whom were employees in various capacities of the American Cyanamid Company of Connecticut. In addition to Thurston, the witnesses testifying on behalf of the junior party were: Donald G. Patterson, John H. Fletcher, Margaret D. Humm, Thelma G. Bills (all of whom were chemists, the latter two being in the analytical laboratory), Robert C. Swain (director of the chemical research division), and James Edwin Archer (patent attorney for the company).

Thurston testified that he had been employed for seven years as a chemist for the American Cyanamid Company, the major part of his work there being in the field of organic nitrogen chemistry and in the field of amino aldehyde resins. Supporting his recital of events by entries in various notebooks, which were introduced in evidence as exhibits, Thurston stated that he first conceived the idea of reacting $y$ nitro butyronitrile with acrylo-nitrile to form $y$-nitropimelic nitrile on March 22, 1939, and that he began the first preparation of $y$-nitropimelic nitrile on April 5, 1939, and completed it on April 6, 1939. According to his testimony, he prepared the compound by the reaction of nitromethane and acrylonitrile in the presence of liquid ammonia, purified the same, and tested the purified product in various ways and determined its melting point.

Thurston identified Exhibit 12, referred to above, as being a sample of the $y$-nitropimelic nitrile prepared by him at that time and stated that the inscription on the label of the bottle—"230–1–6–66," "M. P. 65–66°," and his name—was in his handwriting, and that the sample was placed in the bottle on April 10, 1939. Thurston testified that he sent a request for an analysis of a sample marked "230–1–6–66" to Mr. W. H. Harding, who was the technical director of the Technical Service Division

of American Cyanamid, and that it was the customary practice to route all requests for work through Mr. Harding. This request was made on or before August 2, 1939. Thurston identified a photostat of a report of the Micro Analytical Laboratory of the carbon, hydrogen, and nitrogen analyses of the sample submitted with his request mentioned above, and he testified that he received this report approximately August 12, 1939, and that the analyses prove that the compound was $y$-nitropimelic nitrile. Thurston stated that the bottle and its sample contents were returned to him after completion of the analyses and had been in his custody until he gave the same to Mr. Archer of the Patent Department. According to Thurston's testimony, Archer was present when he produced $y$-nitropimelic nitrile on April 5 and 6, 1939.

Archer testified by deposition, and from his testimony we quote the following pertinent portions:

"* * * deponent observed Dr. Thurston adding nitromethane to liquid ammonia contained in a Dewar flask which resulted in precipitation of some material within a short time. Thereafter Dr. Thurston added acrylonitrile to the contents of the Dewar flask and agitated the reacting mixture which was reddish in color. Shortly thereafter Dr. Thurston showed deponent the product which had been recrystallized from the reacting mixture previously observed, and this product was a white crystalline solid the crystals being rather fine needles;

"* * * the foregoing observations of Dr. Thurston's reaction of nitromethane with acrylonitrile in the presence of liquid ammonia and the product thereof took place in the Spring of 1939;

"* * * during the Summer of 1939 deponent requested Dr. Thurston to supply deponent the necessary details covering the reaction of nitromethane and other nitroparaffins with acrylonitrile and the products produced according to that reaction for the purpose of preparing a patent application, and that at that time Dr. Thurston stated that he had never had the sample of white crystalline material which he

had obtained by reacting nitromethane and acrylonitrile in liquid ammonid analyzed, and therefore, he thought that this should be done first in order to determine what he had obtained. In deponent's presence Dr. Thurston thereupon placed the white crystalline solid in a small sample bottle and inscribed the Code No. 230–1–6–66 of the preparation of his compound on a label together with the melting point which he had determined, and his name, and affixed the label to the bottle;

"* * * deponent believes and therefore avers that the bottle containing the white needle-like crystalline solid bearing a label having the Code No. '230–1–6–66, M.P. 65–66°, Thurston' which has been introduced into evidence as Thurston Exhibit No. 12 is the same bottle and contains the same material which was mentioned in the preceding paragraph."

Archer stated he was shown a report by the Analytical Division which purported to be an analysis of this sample and, according to Archer, Thurston stated this analysis showed that the white crystalline compound was y-nitropimelic nitrile. On cross-examination of Archer the following question and answer appear of record:

"XQ1. You state that on one occasion you saw Dr. Thurston react acrylonitrile with nitromethane in liquid ammonia. How did you identify these compounds? A. I did not analyze them. They were taken from bottles labelled in the customary fashion."

Swain testified that he was employed as a group leader in the Research Division of American Cyanamid and that Dr. Thurston was a member of the group under his direction in 1939. He stated that he knew that Thurston reacted acrylonitrile with nitromethane and the following is quoted from the cross-examination of this witness:

"XQ3. You mentioned that you knew that Dr. Thurston reacted acrylonitrile with nitromethane. Did you participate with Dr. Thurston in carrying out that reaction, and if so, to what extent? A. My participation in this particular reaction was mainly that of an onlooker. I was aware of the work being done and remem-ber observing the apparatus during the course of the work."

Swain also testified on cross-examination that in reacting acrylonitrile and nitromethane three compounds theoretically might result, that is to say, "when there is no data to guide the conditions of the reaction, it could be expected that mixtures will result."

The testimony of Humm and Bills shows that they analyzed a compound in August, 1939, which was sent to them by Dr. Thurston. The report of this analysis, which they identified and which is in evidence as an exhibit, represents the results of a carbon, hydrogen, and nitrogen analysis on a sample of material marked "230–1–6–66."

Patterson, another of the chemists employed by American Cyanamid, testified that y-nitropimelic nitrile was prepared in his laboratory as a result of a suggestion made to him by Dr. Thurston and that this material was made prior to September 28, 1939, by John Fletcher, a laboratory assistant employed there for the summer. Patterson further testified he had hydrogenated the product made by Fletcher, that he had purified and titrated the hydrogenated product to determine its amine number, and that the test showed the product to be a triamine of the expected composition.

Fletcher's testimony was to the effect that he received orders from Patterson to prepare y-nitropimelic nitrile from nitromethane and acrylonitrile and that he did not know what became of the material after he prepared it.

The board, in discussing the proof said:

"A summary of all this testimony indicates that Archer saw a process carried out which should allegedly result in the compound of the count. It has not been established that he saw the product isolated and purified. After the allege purified sample was shown to him by Thurston it apparently remained in Thurston's custody until some later date when it was bottled, given a code number and apparently analyzed. After this analysis was completed, the sample was again returned to Thurston and remained in his custody until the

commencement of the present proceedings. * * *

"These facts become of considerable importance in the instant case, for Archer, who was the principal corroborating witness, apparently had to rely on Thurston for the identification of the original substance as well as for the reidentification thereof on two later occasions. Archer did not and apparently could not testify of his own knowledge that the product first shown him by Thurston was in fact the product of the process he had previously witnessed. Moreover, Archer could not know of his own knowledge that the product he later saw being labelled 260–1–6–66 was the same as that previously shown to him by Thurston.

"Finally, Archer could not know of his own knowledge that the contents of the present exhibit 12 was the same as that originally placed in the bottle in his presence several years before. His uncertainty on this latter point is clearly shown in his own testimony where he states:

"That deponent believes and therefore avers that the bottle containing the white needlelike crystalline solid bearing a label having the Code No. '230–1–6–66, M.P. 65–66°, Thurston' * * * is the same bottle and contains the same material which was mentioned in the preceding paragraph.

"This testimony clearly shows that Archer commendably recognized that his knowledge concerning the contents of exhibit 12 is, in the final analysis, dependent on Thurston. The fact that he 'believes' the contents to be as stated undoubtedly shows his confidence in Thurston, but for our purposes his testimony is necessarily hearsay, and deponent[']s complete confidence in Thurston cannot lend any additional weight to such testimony.

"It must be further recognized also that it is not only in the interim between the labelling of the compound 'during the summer of 1939' and up to 'May 1944' that the compound was in Thurston's possession and accordingly that its identity was dependent on him. ·

"As stated before, there is no suggestion in Archer's testimony that he saw the alleged compound isolated. Rather, the product was apparently shown to him sometime after the alleged preparation. From Thurston's testimony it would appear that this period was at least four or five days. * * *

"Again, it appears that some time transpired between this first showing which apparently took place 'in the Spring of 1939' and the second showing at the time of the labelling 'during the Summer of 1939'. In each of these instances the compound came from, and went back into Thurston's custody. In other words, Thurston showed the compound to deponent in each case.

"Under the circumstances it is difficult to see how Archer could know of his own knowledge what the identity of the compound really was at any time, or that he could know that it resulted from the reaction which he had previously observed.

"In view of the consistent and strict requirements for corroboration of an applicant's testimony which *has* been laid down in repeated decisions of the Court of Customs and Patent Appeals, it is not believed that the testimony of Archer suffices to establish that Thurston actually prepared the compound of the count."

At this point a number of authorities were cited, principally decisions of this court. The board continued:

"A further weakness exists in the present case inasmuch as the significance of the analytical tests for C, H, and N are not explained. Thurston stated simply that the tests proved that the compound was $y$-nitropimelic nitrile * * * and this is essentially repeated by Archer. In the total absence of explanation as to how this conclusion was reached it is not believed that the tests can be considered so conclusive. It must be emphasized that a test that agrees with the theoretical C, H and N content of a desired compound does not necessarily prove the identity of the same compound. In the instant case there was the additional element of oxygen present which was not determined and no molecular · weight determination appears to have been made.

"In view of the limited testimony bearing on this test data we cannot find that Thurston has established with reasonable certainty that the compound tested was in fact that called for in the count.

"Swain's testimony also relates generally to Thurston's work, but Swain was Thurston's superior and the most that can be ascertained from his testimony is that he saw Thurston react acrylonitrile and nitromethane. It is not clear that he saw any product. He expressed however that the product of such a reaction would be impure and would theoretically consist of a mixture of three compounds. * * * His testimony therefore does not contribute anything essentially toward establishing the preparation and identification of the compound of the count beyond that already testified to by Archer.

"Since it cannot be found that the identity of the compound prepared by Thurston has been adequately established it follows that he has failed to establish reduction to practice of the compound of the interference count in 1936. [sic]

"Following the work of Thurston in 1936 [sic] there is a further record of the alleged preparation of the compound of the count by Fletcher in 1939. A record of this experiment appears in exhibits 16 and 17 which are two pages of Fletcher's notebook.

"It appears that Fletcher received orders from Patterson to prepare y-nitropimelic nitrile which compound was later to be hydrogenated to the triamine.

"Fletcher reacted nitromethane with acrylonitrile but apparently did not purify the resulting product * * *. He further stated that he did not know what became of the material after he prepared it. * * *

"Patterson next testified that he had hydrogenated the product that Fletcher had made * * * and that he had purified and titrated the hydrogenated product to determine its amine number. He stated that the test showed the product to be 'a triamine of the expected composition' * * *.

"Here again as in the case of Thurston's work we have the question of the identify of the product prepared by Fletcher. In view of testimony by Swain that mixtures resulted from the reaction of nitromethane and acrylonitrile, it is difficult to see how Fletcher could have produced a pure product and .no purification was apparently carried out by either Fletcher or Patterson.

"Therefore, when Patterson says that the product of the reducing step proved to be 'a triamine of the expected composition' it does not appear to contribute much toward identity of the original compound from which the amine was made. This is especially true in the absence of any records of the amine tests and the further admission by Patterson that it is not possible to positively identify a compound by its amine number. Since the amine in this case is one step removed from the product of the count it follows that any uncertainty as to the composition and structure of the amine would introduce even greater uncertainty into the composition of the parent material.

"It must be found accordingly that it has not been established with reasonable certainty that the product made by Fletcher was in fact the y-nitropimelic nitrile of the interference count.

"Having found that the junior party has failed to establish that he reduced to practice prior to the senior party's filing date it remains only to consider the possibility of early conception coupled with reasonable diligence extending from just prior to the Wulff et al. filing date and up to Thurston's filing date. This issue may be disposed of by observing that during this critical period between the two filing dates, there is no record of any activity on the part of Thurston.

"The result is that the junior party Thurston cannot prevail in this interference."

Certain phases of the testimony other than the pertinent portions we have set forth above may appear in the quotation from the board's decision. We have quoted the entire discussion of the subject made by the board because it seems to be a proper resumé of the testimony and its conclusion therefrom is fully justified.

In this court Thurston's chief complaint is against the strictness of the rule, in cases of this character, of the necessity for corroboration of the testimony of an inventor. With great earnestness, appellant has pointed out the hardship on junior parties in chemical cases such as that at bar which results from the strict application of the rule. After pointing out that there are only a few instances in the entire field of law where the strict rule of corroboration is applied, appellant argues that the rule should not be applied with its usual strictness in chemical cases where new compounds emanate from large and well-conducted laboratories in the ordinary course of business and procedure.

Appellant points out that in some instances respectable authority has criticized the application of the patent law rule of the necessity for corroboration and insists that the proper rule to apply is to the effect that if the testimony is convincing, and particularly if it is supported by other facts and circumstances which strengthen the testimony of the inventor, it should be regarded as sufficient. He points out that in well-conducted, large laboratories such as the one involved in the case at bar and in other well-operated business establishments where well-kept books and records are prepared and complete data on experiments properly compiled and filed there is not much opportunity for fraud being perpetrated and that, under such circumstances, there is little likelihood that the inventor's testimony would involve perjury.

We are in sympathy with the contentions of appellant that the application of the harsh rule of independent corroboration, as the doctrine is sometimes referred to, works a great hardship in many cases where there is not the least suspicion of fraud or perjury and where the testimony, under other circumstances, would be regarded as convincing and accepted as sufficiently probative.

Nevertheless, we cannot agree with the proposition that no corroboration of an inventor's testimony is necessary. An inventor's testimony, however, might be corroborated by facts and circumstances other than by an independent witness. Such proof or evidence should be independent of the testimony of the inventor and should not consist of self-serving documents prepared by him or under his direction, nor should it be based upon facts the truth of which depends upon information received from the inventor.

This is not the first time that this court has been confronted with circumstances where, although it seemed reasonable to conclude that the inventions emanated from the sources claimed by the inventors, who worked in well-conducted laboratories, we were required, by reason of the necessity for corroboration, to reject the proof offered. Collins v. Olsen, 102 F.2d 828, 26 C.C.P.A. (Patents) 1017.

In order to liberalize the rule sufficiently to meet the expressed views of appellant and to justify our acceptance of the proof rejected by the board in this case as establishing reduction to practice, the well-settled practice in this connection would necessarily have to be discarded, and we think more harm would result to patent jurisprudence than any benefits that might be derived by doing so. In other words, long experience by the courts and others interested in patent jurisprudence has, with singular unanimity, brought forth the emphatic conclusion that independent corroboration of an inventor's testimony is absolutely requisite in determining the acceptability of such testimony as proof of reduction to practice.

The board pointed out the particulars in which appellant's proof has failed to meet the requirements of the law and we cannot express it any better than it is expressed in the board's decision. Suffice it to say, in conclusion, that there is no corroboration as to the starting material, but even if there were there is no corroboration that the material Thurston bottled in the presence of Archer was the material received by the analysts or that the material analyzed was the identical material which was later returned to Thurston and then given by him to Archer, the patent lawyer. Under ordinary circumstances it would be reasonable to conclude that events happened just as is claimed. There is no suspicion of any attempt on the part

of any of the witnesses, all of whom are of high character, to falsify or make misleading statements. But if the settled rule is applied under circumstances such as those at bar, and we think it must be applied, no other conclusion can be arrived at except that which the board reached.

Thurston seems to claim in this court that a separate reduction to practice is established by the testimony of Fletcher and Patterson. The board pointed out, and we think properly, that this testimony has the same defects as that relied upon with respect to Exhibit 12. If Thurston's proof fails by reason of lack of corroboration and proof of identity to meet the requirements of law it is not seen how the weaker testimony of Fletcher and Patterson could be accepted as proof of another and separate reduction to practice.

It follows that the board properly awarded priority of invention of the interference count involved to the senior party, appellee, and its decision so doing is affirmed.

Affirmed.