52 CCPA

**Frederic O. HESS, Appellant,**

v.

**Charles C. BLAND, Appellee.**

**Patent Appeal No. 7414.**

United States Court of Customs and Patent Appeals.

July 15, 1965.

836

Harry R. Pugh, Jr., New York City (Lee C. Robinson, Jr., New York City, of counsel), for appellant.

Edmund C. Rogers, Glenn K. Robbins, St. Louis, Mo., for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

MARTIN, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding priority of invention in Interference No. 91,619 to Charles C. Bland, the senior party. Bland's involved application, serial No. 677,651, was filed on August 12, 1957 and is assigned to Flex-O-Lite Manufacturing Corporation. The junior party, Frederic O. Hess, is involved on the basis of his application serial No. 804,466, filed April 6, 1959, assigned to Selas Corporation of America and licensed exclusively to Potters Brothers, Incorporated.

The interference relates to a process for making glass beads or spheres. The Hess application refers to the beads or spheres as "such as are used in reflecting tape and paint" and states that they "should be small, uniform in size and clear for best reflective qualities." In the Bland application, the beads produced are said to find:

* * * particular utility as reflective beads used in highway marking paints, roadside signs, provided with coatings of paint, enamels, lacquers, asphalts or thin plastic sheetings upon which the beads are embedded and which are adapted to be illuminated at night and for the reflective illumination of other surfaces through reflection from a beam of light directed upon the surface. * *

In a widely used prior process for producing glass beads, scrap glass is first crushed and the crushed particles then fed into a flame and carried along with the combustion gases and other products of combustion. The particles soften from the heat during their movement and, as a result of surface tension, assume a spherical shape to form glass beads.

The process in issue involves producing glass beads from a stream of molten glass. The molten glass is discharged from a crucible or furnace in a vertically downwardly flowing stream of relatively low viscosity. A blast of high velocity gas is discharged against the stream at substantially a right angle to the stream to disperse it into a multiplicity of glass particles. The blast of gas carries the particles through a path which is maintained at an elevated temperature to allow the particles to be shaped into spheres as a result of surface tension. The spheres are then cooled so that they solidify and are collected. The single count of the interference reads:

1. The method of forming glass beads comprising discharging a molten glass stream of relatively low viscosity in a vertically downward direction from a source of supply, discharging a blast of high velocity gas against said stream at an angle thereto and of sufficient magnitude to disperse said stream into a multiplicity of glass particles, said blast immediately thereafter carrying said particles through a path maintained at an elevated temperature sufficiently high to allow surface tension to shape the particles into spherical form, cooling said spheres to solidify same and collecting said spheres.

The question to be determined is whether certain tests performed in a laboratory of Selas from June through mid-September of 1954 amounted to reduction of the invention to practice. The board concluded they did not. Since the record shows no activity on behalf of Hess from September 1954 until his application was filed in 1959, there is no contention that Hess can prevail on the basis of earlier conception followed by diligence.

The record shows that Selas engaged in engineering and research development work in the combustion and heat application fields for its own direct benefit in the production and sale of burner products and in similar work in developing processes and products for customers in the hope of selling them Selas' burner products. Potters Brothers, one of Selas' customers, was a manufacturer of glass beads and "glitter," the beads being an ingredient of "reflectorized" white and yellow paint used for marking highways and for directional, traffic guidance, and warning signs. Selas itself was not in the business of producing glass beads.

In the spring of 1954, Selas, through Hess, its president, proposed an agreement with Potters Brothers for Selas to conduct research work toward developing a new process for the production of glass beads. That proposal was accepted by Potters Brothers. Hess then advised the head of the research department, Furczyk, and an assistant, Henwood, of his concept for producing glass spheres directly from a stream of molten glass. He stated that they should build a small melting unit with an outlet at the bottom to provide a glass stream and apply a superheat burner to disperse the glass stream. He also discussed building a heating chamber and a collecting chamber and running tests to "verify whether the idea is practical and whether it works."

Discussions of the problem between Furczyk, Henwood and others at Selas resulted in Liddell, a technician under Henwood, being assigned to conduct tests. During the period starting sometime in June 1954 and ending July 21, 1954, Liddell, assisted by another technician, Hepburn, ran a series of tests. Those tests, designated tests Nos. 1 through 17, are described in laboratory notebook No. 47, which Liddell obtained for reporting experiments on the glass sphere project for Potters Brothers. The pages of the notebook pertinent to tests Nos. 1 through 17 were introduced in evidence and testimony concerning them given by Liddell and other witnesses. Those tests involved causing melted glass in a crucible to spill out through an orifice and projecting the flame of a superheat burner transversely of the stream of glass to deflect it, but apparently did not employ either a chamber to maintain the heat of the deflected glass or collecting means. Liddell conceded that the process did not operate successfully during those tests and Hess does not rely on them as constituting reduction to practice.

After the last of Liddell's tests, work on the glass sphere project was continued by Chen, a research engineer for Selas. Chen first discussed the project with Henwood and Furczyk around August 3, 1954, on which date he summarized his conclusions regarding Liddell's work in the Selas laboratory notebook on the project. Subsequently, Chen reported in the notebook on tests Nos. 18 through 26, conducted between August 4, 1954 and September 3, 1954, and test No. 27, in the form of a demonstration for representatives of Potters Brothers conducted on September 13, 1954.

Hess does not contend that the process in issue was reduced to practice in each of the conducted tests. Rather he relies on tests Nos. 21, 24, 26 and 27 for that purpose. However, the intervening tests are so related to those particular tests that they must also be considered to get the overall picture.

Tests 18 through 27 utilized a hot chamber for maintaining at an elevated temperature the area through which the glass particles blasted from the molten stream pass, in order to cause the particles to coalesce into beads of spherical shape as the result of surface tension.

The chamber identified by Chen as used in test No. 21 was described by him as follows:

> * * * a ceramic cylinder with eight superheat burners mounted in the wall firing to the center of the cylinder. At one end [the left end] of this cylinder there is a hole provided for the high velocity high temperature burner. On the top left of the cylinder, also a hole for the molten glass to enter.

Chen further testified that the other end of the chamber was open to the room. Chen's report in the laboratory notebook on the results of test No. 21, which took place on August 13, 1954, includes:

> In the first 30 sec of atomization, there are hardly any fibers issued from the chamber. Glass spheres are collected on the ground. After then the chamber cracked suddenly near the first row of superheat burners, and fibers are beginning to come out. * * *
>
> The fibers are fine. However, the spheres collected on the ground are encouraging. Most of the spheres are round except very few of them have a tail.
>
> * * * * * *
>
> According to the result of this test, it is very encouraging that we proved at least possible to make glass spheres by means of atomizing the molten glass with a high temperature gas jet in a hot atmosphere. Although the size of the spheres are not satisfactory, it will be a matter of jet velocity, temperature of chamber, length of chamber and glass temperature.
>
> It should be noted that the forming of fiber after the chamber wall cracked indicates the importance of chamber temperature at which the glass is atomized.

In the next test, No. 22, Chen tried a new heat chamber with the diameter increased to ten inches and a different burner arrangement while seeking to "duplicate the results obtained in test No. #21." The crucible broke, however, and the test was not completed.

Test No. 23 employed the new chamber also. It produced fibers with very few spheres. Chen's notebook report of the test further states that "Glass sticked [sic] on the chamber wall." The notebook also includes a statement that Furczyk [1] raised the question "why the amount of glass issued from the chamber is not as much as it should be" and a statement by Henwood as follows:

> * * * Mr. Furczyk expressed *"deep disappointment"* in the test and great concern over the progress of the project. Surely we all do our best to make things work as planned but the very nature of our work sometimes requires patience. It is much easier to be morose under adverse circumstance than to come back fresh, buoyant and interested for the next assault toward obtaining a solution. We agree to attempt to assume this attitude because it is an important ingredient in the solution of problems with which we are confronted.

Test No. 24, the next test relied on to show reduction to practice, was run on August 27, 1954 utilizing a V-shaped nozzle on the main burner and using the ten-inch diameter chamber having eight additional superheat burners. The operation here was started with the eight burners burning but they were shut off after 40 seconds operation. Formation of fibers instead of spheres commenced immediately thereafter and continued even after the burners were relighted. Later the V-nozzle was blown out. Chen stated in the notebook that "The glass spheres obtained are large and shinny [sic]" and also commented:

> The glass sphere [sic] obtained in this test indicates the possibility of atomizing molten glass in a hot chamber of 2400°F with superheat burners firing normally, but the size

---

1. Furczyk did not testify, having died before testimony was taken.

of the spheres and the percentage of glass sticking on the walls indicates the improper arrangement of the superheat burners. * * *

The following test, No. 25, involved the use of a channel-shaped nozzle blowing jet instead of the V-shaped nozzle which was used in test No. 24. Chen's notebook entry states that a combination of glass fibers and spheres was formed in this later test and that the spheres were not shiny and most of them were white opaque color. The entry further refers to the test as having formed "fiber and poor quality spheres."

On September 3, 1954, test No. 26, the third relied on, was run using a new heat chamber. Chen's notebook entry of the results of that test reads:

Results: The spheres obtained are larger than the standard sample. Some of the spheres are not shinny. [sic] Many small air bubbles are seen in the spheres under a microscope. Air bubbles in the glass might indicate either improper refining of the glass or insufficient heat in the hot chamber.

Total amount of glass spheres and fibers produced are small compared to the amount of glass batch fed into the crucible. Apparently quite a [sic] amount of glass sticked [sic] on the wall, but we believe some of the very fine particles are lost into the room due to the strong turbulent air.

The last test, No. 27, was conducted at the Selas laboratory as a demonstration for representatives of Potters Brothers. The text of Chen's notebook entry on that test, in evidence as part of Exhibit 20, is reproduced in full below:

T. N. Chen

Sept. 13, 1954

Witnessed by: James B. Henwood

Test 27:

Object: To duplicate test #26

Apparatus: Same as in test #26 except the material of the needle valve.

Procedure: Glass are heated to 2850°F. A–11 chamber wall are at 2300°F. Blowing burner operating at 5 psig chamber pressure. By the time everything is ready, part of the needle valve rod breaks and are disolved [sic] in the glass. After several minits [sic], the orifice is finally opened up by pushing a steel rod through it. The glass was not flowing continueously [sic]. The hot chamber temperature is quite low when glass start to flow.

* * * * * *

Results:— Mostly spheres are formed. Some of the spheres are not round and having tails.

Meeting: The above test was run in the presence of Mr. Potter and Mr. Wood from Potters Bros. INC. After the run, a meeting attended by Mr. Potter, Mr. Wood, Mr. Furczyk, Mr. Henwood, Mr. Liddle [sic] and Mr. Chen was carried on.

Comment on the products: Mr. Potter and Wood both realized and approved that our present method can and do [sic] produce glass spheres as they wanted through single stage process. The quality of the spheres was not satisfactory to them because of the size and the roundness. Mr. Wood pointed out that the heating time of two and half hours from glass batch to 2900°F glass is too short compared to their standard refining time of eight hours. Besides, the glass batch being used will not be the kind to make glass spheres. They will send us some good batch for future tests. Six or eight hours of heating time of glass was suggested for the next run in order to examine the result effected by the refinement of the glass.

Suggestions and discussions on future plan:

Mr. Furczyk stated the behavior of glass stream at the point of

atomization, that is, the glass actually riding above the main jet. According to this fact, Mr. Furczyk presented his idea of a vertically blow down system in order to trap the glass stream in the main jet as shown in the sketch on the left. Mr. Wood stated his objection about this idea in practical point of view that it is rather difficult and impractical to him to lift a 30 ton/hr. glass tank to a level about 20 to 30 feet above ground in order to fit in this vertical type atomizing system.

Final decisions: Agreements and decisions were finally reached. Our future work will be to make good spheres by any method disregarding the practical point of view. Sodium-lime glass will be used for several tests on the present set up with specified refining time before any change being made in order to compare the results to those from the previous runs.

Despite the reference in the report to future plans and future work, there were in fact no further tests of the process. The only acts the record shows after the September 13, 1954 test are the filing of the Hess application on April 6, 1959 and the building of equipment utilizing the process by Potters Brothers in 1960.

In commenting on tests Nos. 21, 24 and 26, the board stated:

* * * in test #21, spheres, most of which were round, were collected from 30 seconds of operation though the size was not regarded as satisfactory; in test No. 24, "quite large" glass spheres were collected from 40 seconds of operation and then fibers were formed and the nozzle failed, "large and shinny" (sic) spheres were produced, the notes indicate the "possibility" of atomizing molten glass in a hot chamber but the size of the spheres and sticking glass indicated that further changes were

in order; and in test No. 26 spheres larger than the standard sample were obtained, some were shiny, some were not shiny and some had air bubbles in them, glass stuck to the hot chamber walls, improper glass refining or, insufficient hot chamber heat were indicated.

It then concluded:

Clearly, the records of those earlier tests on their faces negate the existence any conviction of success that is now being urged on us as having been present then. Paraphrasing the language in the opinion in the case of American Foundry and Machine Co. v. Liggett Myers Co. [172 F.Supp. 12], 121 USPQ 133 aff'd [272 F.2d 451] 123 USPQ 396) at page 140 it may be said that the tenor of the quotations from the records prepared by Chen may properly be characterized as "one of hopeful expectancy" and that these records

"nowhere reflect a conviction that the sought-after (process here) had been attained. Indeed the opposite is true."

With respect to test No. 27, the board stated:

█ As of the completion of test No. 27 the record reveals * * * that the matters of flattened beads, adequate quantity of molten glass for the production of any sizable quantity of beads, and glass fining or refining time had not been determined, though it was strongly urged that these matters were no problem and that their solutions were obvious. There was also the matter of glass sticking to the interior walls of the hot chamber. However, the issue here is not whether it might be possible to reduce the invention to practice but whether it has in fact been reduced to practice. * * *

The board regarded that test as also failing to show the process operated satisfactorily to produce useful glass

spheres. It concluded that Hess had not sustained his burden of proving actual reduction to practice by a preponderance of the evidence.[2]

■■ As stated in Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610, a process is reduced to practice when it is successfully performed. Applying that criterion to the facts of the present case, we are not satisfied that the board erred in finding Hess did not reduce to practice. The count defines a process of producing beads in spherical form. Yet the beads formed in the tests were of questionable quality so far as spherical form is concerned and many were unusable for use as reflecting beads as the parties contemplated for the additional reason that they had air bubbles. Moreover, the record does not establish that beads of the size, shape and quality actually produced were known to be suitable for any specific purpose.

It is clear that the witnesses generally took a more optimistic view of the test results in their testimony in 1962 than their statements and action reported contemporaneously with the tests would appear to warrant. Under those circumstances, we are inclined to place greater weight on the contemporaneous reports and action. On that basis, we must agree with the board's view that the record leaves a clear impression that the experimenters were not satisfied in 1954 that the process had been performed successfully. The fact that Exhibit 20, quoted above, reports on suggestions for further tests after test No. 27 strongly supports that conclusion.

Hess urges that the notebook entries expressing dissatisfaction with the size of the beads produced in some of the tests "were occasioned by the fact that the beads were larger than the particular sample submitted by Potters Brothers."

In connection with that matter and the air bubbles in beads from some tests, he refers to the testimony of Wood, then President of Potters Brothers, as demonstrating that larger beads were satisfactory and that beads having air inclusions could be used for some industrial purposes and that markets were available. That testimony of Wood was given in 1962 and, even at that date, nearly eight years after the tests, no specific use for such beads was specified. Wood's testimony further included the statement in connection with test No. 27, the only test he witnessed, that the beads contained "a substantially large amount of larger sizes" than normally manufactured for the "highway trade" and that the amount of air bubbles was such that the beads "would have to be used in areas that did not require optical properties or structural properties." Wood's 1962 testimony must be weighed with the report by Chen in 1954 that "The quality of the spheres was not satisfactory [to Potter and Wood] * * * because of the size and the roundness."

With respect to the air bubbles which occurred in the beads of tests Nos. 26 and 27, Hess further relies on an affidavit which the party Bland filed in his application as evidence of usefulness of beads having bubbles. In the affidavit, filed in 1960, Bland referred to certain beads he had produced as "of a spherical nature" and "of an 80 mesh size and smaller," about 25 per cent of which "had air inclusions which were less than $\frac{1}{4}$ of the diameter of the beads." He stated those beads were of an acceptable nature and met various government specifications and had commercial utility. That affidavit is not significant here since it is not established that Hess' beads had the same qualities as those Bland refers to. In particular, it has not been shown that the Hess beads were of the same quality so far as "spherical

2. The interference being between copending applications Hess has the burden of proving his case by a preponderance of the evidence. Creamer v. Kirkwood, 50 CCPA 715, 305 F.2d 486.

nature" is concerned or that the air inclusions were less than ¼ of the diameter of the beads.

It is further argued by Hess that neither the crack that developed in the chamber of test No. 21 nor the sticking of the glass to the hot chamber walls during tests Nos. 24 and 26 were considered problems. However, there would seem to be considerable doubt that a run that broke down after only thirty seconds operation producing only a small number of beads of questionable quality, as did test No. 21, could be regarded as a successful operation of the process amounting to a reduction to practice even if the operator thought he could avoid the cracking in future operations.

Sticking of glass to the chamber walls, was first commented on in connection with test No. 23. It seems to have been regarded seriously by Furczyk for he then questioned why the amount of glass issuing from the chamber was not as much as it should be and expressed "deep disappointment" in the test and "great concern" over the progress of the project. Even though a new nozzle was used in test No. 24, the percentage of the glass sticking on the chamber wall was noted. When test No. 25 using a different nozzle with the same size chamber as test No. 24 failed to operate satisfactorily, a smaller diameter chamber was used in test No. 26. However, "quite an amount of glass" again stuck to the chamber wall and it was noted that the total amount of spheres and fibers produced was small compared to the amount of glass batch fed into the crucible. Moreover, Chen conceded in his testimony that, even after test No. 27, the problem of getting the chamber large enough to avoid excessive deposit of the glass on its walls while avoiding excessive heat loss was unresolved. Also, Chen testified that he stacked bricks over the open end of the chamber to heat it up before starting operation of the tests and the record shows that the chamber temperature tended to drop rapidly upon removal of the bricks to permit operation.

Hess argues that the board failed to recognize the significance of the payment of $25,000 to Selas by Potters Brothers, urging that the agreement between the two required payment of that amount only in the event of a successful development. While the payment is a factor to be considered, and the board did consider it, we do not think it is convincing that a reduction to practice had been achieved. The agreement expressly stated that the arrangement was "based on the assumption that the process will prove considerably more economical than your [Potters Brothers'] present process, and possibly entail other operational advantages which would more than reimburse Potters Brothers for this final payment, as well as the cost of the experiments." Yet Wood testified that "the ultimate cost of beads as produced from the batch through the Hess process * * * would cost more than our system." It is thus apparent that Potters Brothers accepted less than full compliance with the terms of the agreement as the basis for payment of $25,000. In fact, the only specific testimony regarding the payment is Wood's answer "yes" to the inquiry on cross examination: "You paid $25,000 for the experimental work, didn't you?" It is not explained when that amount was paid or under what conditions nor whether that was the total amount paid.[3] Under these circumstances, the fact that $25,000 was paid "for the experimental work" is not convincing evidence that a reduction to practice was attained.

Another argument of Hess is that it is difficult to believe that Selas would have scheduled the demonstration, test No. 27, for Potters Brothers if the performance of the equipment had left doubts that it would function properly. However, that argument is not at all persuasive of a reduction to practice un-

3. The letter of agreement referred to "an expenditure not to exceed $5,000" as well as the single "additional payment of $25,000."

der the facts of the present case. Thus, Henwood testified as follows:

Q177. In general, what stage would a development program of this type have to have reached before you decided to go ahead with a demonstration? A. Usually the first indication of success was followed by a demonstration to the client.

Hess himself testified that once a project has gone far enough that they think they have something to demonstrate, "we sometimes like to get a customer's reaction for the work we have done up to that time because we are spending his money."

Finally, the Hess application was not filed until four and one-half years after the last test, with Mason, Hess' attorney, explaining the delay as follows:

\* \* \* A. Well, during the period of time between the conclusion of this development and the filing of the application, the company was continually busy with various things for themselves and for other clients, and for one reason or another, these other developments or other improvements seemed more important at the time. I never had any intention of not filing an application. It was just that I did not get around to it.

Q62. What was the reason that in late 1958 or early 1959, you took up and began working on the preparation of the Hess application?

A. It had been in my file for a long time and I guess my conscience started to hurt me and there was nothing more pressing at the time.

The fact, established by the record, that the interested people from Selas and Potters Brothers did not act to hasten the filing strongly tends to confirm the impression given by the record as a whole that they were less than convinced of the success of the project at the time the last test was made.

It is obvious to us from the board's decision that it carefully weighed the testimony and other pertinent evidence of record in reaching its decision, and we are not convinced that it erred in reaching its conclusion that Hess has failed to meet his burden of proving his case by a preponderance of the evidence. The decision therefore is affirmed.

Affirmed.