Stanton L. REESE and Herbert M. Katz, Appellants,

v.

Fred J. HURST and David J. Crouse, Appellees,

v.

Tadeusz Karol WIEWIOROWSKI and David James Miller, Appellees.

Stanton L. REESE and Herbert M. Katz, Appellants,

v.

Fred J. HURST and David J. Crouse, Appellees.

Stanton L. REESE and Herbert M. Katz, Appellants,

v.

Tadeusz Karol WIEWIOROWSKI and David James Miller, Appellees.

Appeal Nos. 81–525 to 81–527.

United States Court of Customs and Patent Appeals.

Oct. 15, 1981.

Harvey B. Jacobson, Jr., D. Douglas Price, Washington, D.C., John D. Nies, Arlington, Va., of counsel, for appellants.

Jack Q. Lever, Jr., Irving Barrack, Judson R. Hightower, Washington, D.C., for Dept. of Energy.

Before MARKEY, Chief Judge, RICH, BALDWIN, MILLER, and SMITH,* Judges.

MILLER, Judge.

These consolidated appeals from the decisions of the Patent and Trademark Office Board of Patent Interferences ("board") involve three separate parties and three separate interferences: (1) a continuation-in-part application of Stanton L. Reese and Herbert M. Katz ("Reese") filed December 2, 1970, Serial No. 94,594, and their parent application, Serial No. 882,808, filed December 5, 1969. These applications are assigned to Uranium Recovery Corporation ("URC"); (2) A reissue application of Fred J. Hurst and David J. Crouse ("Hurst") filed January 9, 1974, Reissue Serial No. 432,002, covering Patent No. 3,711,591 granted January 16, 1973, on Serial No. 53,058 filed July 8, 1970. Both the patent and the reissue application are assigned to the United States Department of Energy; (3) A patent granted to Tadeusz Karol Wiewiorowski and David James Miller ("Wiewiorowski") on June 5, 1973, Patent No. 3,737,513, filed July 2, 1970, Serial No. 51,947. This patent is assigned to Freeport Minerals Co. We affirm.

---

* The Honorable Edward S. Smith of the United States Court of Claims, sitting by designation.

## BACKGROUND

Reese, the junior party, and Hurst, the intermediate party, took testimony to establish dates of invention earlier than their respective filing dates. The senior party, Wiewiorowski, took no testimony to establish a date of invention earlier than the filing date, but took testimony in rebuttal to the priority case of Reese.

In all three interferences the board denied Reese's 37 CFR 1.231 motion for the benefit of the December 5, 1969, filing date of the parent application on the basis that the application failed under 35 U.S.C. § 112, first paragraph, to support the count in each interference; and Reese was designated the junior party, based on the December 2, 1970, filing date of the continuation-in-part application.

With respect to Appeal No. 81–525 (" '525"), the board, in awarding priority to Hurst, determined that Hurst overcame Wiewiorowski's filing date by proving actual reduction to practice of the count on June 13, 1969, and that Reese failed to prove an alleged actual reduction to practice on May 29, 1969, or August 3, 1969.[1] The board also determined that Hurst proved diligence from prior to the Wiewiorowski filing date of July 2, 1970, to Hurst's filing date, July 8, 1970; that, although Reese conceived the invention no later than May 28, 1969,[2] their failure to establish a reduction to practice prior to Hurst's June 13, 1969, reduction to practice, mooted the issue of diligence. In response to Wiewiorowski, the board further determined that Reese did not derive the invention from Hurst.

In Appeal No. 81–526 (" '526"), the board awarded priority to Hurst on the same basis as in '525.

In Appeal No. 81–527 (" '527"), the board awarded priority to Wiewiorowski based on Reese's failure to prove their alleged dates of actual reduction to practice and on the failure of their parent application to support the count in interference.

## THE INVENTION

The invention in all three interferences involves a process for the extraction and stripping of uranium from wet-process phosphoric acid. Wet-process phosphoric acid is produced in fertilizer plants by digesting phosphate rock with sulphuric acid. As produced, it contains small quantities of uranium on the order of about 100–200 parts per million ("ppm").

The uranium in the wet-process phosphoric acid is first extracted into an organic extractant comprising a dialkylphosphoric acid ("DEPA") and a trialkylphosphine oxide ("TOPO") dissolved in a water-immiscible solvent, such as kerosene. At the time the present invention was alleged to have been made, this organic extractant was well-known for its ability to extract uranium from wet-process phosphoric acid. The organic extractant has a strong affinity for uranium in the $+6$ valence (hexavalent) state ($U^{+6}$), but a very low affinity for uranium in the $+4$ valence (tetravalent) state ($U^{+4}$).

Once the uranium has been extracted from the wet-process acid into the organic extractant, it is stripped from the extractant with a phosphoric acid strip solution containing from about 40% to 100% by weight phosphoric acid ($H_3PO_4$) having dissolved therein ferrous ion ($Fe^{+2}$).

The counts in interference are set forth below. In '525:

Process for obtaining uranium values from an extractant comprising a dialkylphosphoric acid and a trialkylphosphine oxide dissolved in a water-immiscible organic solvent which comprises stripping the extractant with an aqueous phosphoric acid solution containing from about 40

---

1. Reese does not challenge the board's decision that Reese's August 3, 1969, experiments failed to prove actual reduction to practice.

2. The Reese proofs on conception and actual reduction to practice involve a series of experiments conducted on May 28–29, 1969. These two dates have been used interchangeably to refer to the date of conception and date of alleged actual reduction to practice.

to 100% by weight $H_3PO_4$ having dissolved therein divalent iron.

In '526:

A process for the recovery of uranium from a wet-process phosphoric acid solution derived from the acidulation of uraniferous phosphate ores which comprises contacting said solution with an organic extractant consisting essentially of di(2-ethyl-hexyl) phosphoric acid and trioctylphosphine oxide dissolved in an organic diluent, reductively stripping the extractant of uranium with a strip solution in which ferrous ion is used to reduce uranyl ions in the extractant to uranous ions in the strip solution, and disengaging the strip solution from the organic phase.

In '527, count 3 is illustrative:

Process for obtaining uranium values from an extractant comprising a dialkylphosphoric acid and a trialkylphosphine oxide dissolved in a water-immiscible organic solvent wherein said uranium values in said extractant are in a hexavalent oxidation state, which comprises stripping the extractant with a solution consisting essentially of aqueous phosphoric acid containing from about 40 to 100% by weight $H_3PO_4$ and having dissolved therein an amount of divalent iron effective to cause said uranium values to pass from said extractant into said solution, said process further characterized in that (a) effective stripping of the extractant is the result solely of the presence of the divalent iron in the stripping solution and (b) the uranium values which pass into said solution remain dissolved in said solution.

## ANALYSIS

The principles of law involved in this case are clear and well-settled. It is only the number and complexity of various facts and arguments which cause difficulty. The junior and intermediate parties, Reese and Hurst,[3] had the burden of overcoming Wiewiorowski's filing date with corroborated evidence. *Rodin v. Spalding*, 49 CCPA 870, 872, 297 F.2d 256, 257, 132 USPQ 285, 286 (1962).

---

**3.** In '526 Reese was junior to Hurst, and in '527 Reese was junior to Wiewiorowski.

A corroboration analysis involves a reasoned examination and evaluation of all the pertinent evidence bearing on the credibility of the inventor. *Mann v. Werner*, 347 F.2d 636, 640, 146 USPQ 199, 202 (CCPA 1965); *see Gianladis v. Kass*, 51 CCPA 753, 757, 324 F.2d 322, 325, 139 USPQ 300, 303 (1963).

In recent years, this court, by adopting a "rule of reason," has eased the requirement of corroboration with respect to the evidence necessary to establish the credibility of the inventor. *E. g., Mattor v. Coolegem*, 530 F.2d 1391, 189 USPQ 201 (CCPA 1976); *Anderson v. Pieper*, 58 CCPA 1221, 442 F.2d 982, 169 USPQ 788 (1971); *Berry v. Webb*, 56 CCPA 1272, 412 F.2d 261, 162 USPQ 170 (1969). However, adoption of the "rule of reason" has not altered the requirement that evidence of corroboration must not depend solely on the inventor himself. As this court said in *Mikus v. Wachtel*, 542 F.2d 1157, 1161–62, 191 USPQ 571, 575 (CCPA 1976):

That courts must review the record as a whole and must apply a rule of reason, when evaluating corroborative evidence of actual reduction to practice, does not dispense with the requirement for *independent* corroboration. [Emphasis added.]

Independent corroboration may consist of testimony of a witness, other than the inventor, to the actual reduction to practice or it may consist of evidence of surrounding facts and circumstances independent of information received from the inventor. *Thurston v. Wulff*, 35 CCPA 794, 801, 164 F.2d 612, 617, 76 USPQ 121, 126 (1947). *Accord, Gortatowsky v. Anwar*, 58 CCPA 1266, 442 F.2d 970, 170 USPQ 41 (1971); *Miessner v. Hoschke*, 131 F.2d 865, 55 USPQ 221 (D.C.App.1942).

In an initial, broad attack on the board's decisions, Reese points out that two "rule of reason" cases cited by the board, *Grasselli v. Dewing*, 534 F.2d 306, 189 USPQ 637

(CCPA 1976), and *Berges v. Gottstein*, 618 F.2d 771, 205 USPQ 691 (CCPA 1980), "applied to large organizations which had organized research facilities to perform their research projects." Reese asserts that the board penalized them simply because they had no such research program; that "URC was a fledgling company with no laboratory facilities, no employees and limited financial resources"; that "Reese and Katz could not afford the luxury of having each and every step of their work independently corroborated by a third party"; and that "[t]here is no reasonable basis for a rule of law which benefits larger organizations which can afford organized research facilities and penalizes private individuals and newly formed, fledgling companies, which cannot." However, the basis for the rule of law involved here is simply the paramount public policy of preventing fraud in patent procurement. *Berry v. Webb, supra*, 56 CCPA at 1279, 412 F.2d at 267, 162 USPQ at 174. That policy applies regardless of the size or financial resources of the party seeking a patent. Accordingly, we see no merit to this argument by Reese.[4]

*The '525 Appeal*

■ In '525 the issues are whether Hurst proved actual reduction to practice on June 13, 1969, and whether Reese proved actual reduction to practice no later than May 29, 1969.

A. Hurst Actual Reduction to Practice

The board determined that Hurst proved actual reduction to practice of the count in '525 with a test performed by Mr. William Howerton (Hurst's laboratory assistant) on June 13, 1969. The relevant portion of the board's discussion and analysis concerning these tests is set forth below:

Howerton received permission from Hurst to take the scrubbed organic ex-

tractant sample, which he removed from Hurst's rig on June 13, 1969 .... He told Hurst that he wanted the organic "to do some stripping tests on it for Mr. Crouse" .... In his testimony, Howerton described Hurst's continuous countercurrent rig in detail ..., and he pointed out the exact location on the rig where he took the sample .... The description and location conform to the detailed description and location given by both Arnold [Wesley D. Arnold, Hurst's laboratory partner] and Hurst in their testimony ....

Howerton said that he knew the extractant used in Hurst's rig was an organic diluent having DEPA/TOPO dissolved therein ... and that the acid was wet-process acid .... According to his testimony, some of the ingredients going to make up the extractant were obtained from him ..., and he stated that he saw the labeled cans in which Hurst received the wet-process acid ....

While Howerton did not make a chemical analysis of the acid or extractant Hurst was running in the countercurrent rig, we find the evidence sufficient, under a rule of reason, to establish that he knew that uranium from wet-process acid was being extracted with an organic diluent having DEPA/TOPO dissolved therein. He therefore corroborates Hurst's testimony as to the process carried out by the countercurrent rig on the date of June 13, 1969.

Howerton recorded three stripping tests on page 62 of his notebook .... He said he performed the work shown on this page on the June 13, 1969 date recorded at the top of the page and received the analyses of the test samples from the Analytical Division on June 27, 1969, the date recorded at mid-page. Two of the tests were performed without

4. Reese, in their reply brief, also urge us to eliminate the requirement of *independent* corroboration because of the introduction of "full discovery in patent interferences" in 1971 by adoption of 37 CFR 1.287. Supposedly, the increased discovery available to parties in interference "has weakened the foundation which underlies a requirement for independent

corroboration." Although it is recognized that an opposing party in an interference may be better able to root out fraud because of 37 CFR 1.287, it is, nevertheless, clear that 37 CFR 1.287 does not guarantee that all frauds will be discovered; nor does it substantially replace the protection against fraud that the longstanding rule of *independent* corroboration provides.

divalent iron in the strip solution, whereas the third was performed with divalent iron. Howerton described the tests recorded at page 62 of his notebook as follows . . . . :

> The experiments were stripping tests and the solution which was to be stripped was identified as the head organic which was the scrubbed organic extract from Mr. Hurst's mixer-settler. The three tests were performed by mixing an aliquot of each of the three aqueous solutions which are listed. . . . The third one is 5 molar phosphoric acid with .08 molar ferrous sulfate and $1 \times 10^{-4}$ molar hydrofluoric acid ["HF"].
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> . . . the tests were to be done at about 45 degrees Centigrade, the phase ratio of organic-to-aqueous was 2, the equilibration time, 10 minutes, and they were to be done in a nitrogen atmosphere.

The analytical results for the tests were reported on Analytical Data Report No. D–84621 . . . which Howerton had retained. The results correspond to the entries in Howerton's notebook . . . . Analytical Data Report HX–58 indicates that the samples for the tests were received on June 13, 1969 . . . . The Analytical Division Logbook HX–1 also indicates that Howerton's samples 6504–10 . . . were received on June 13, 1969; that the results were reported to Howerton on June 27, 1969; and that the analysis was performed in Room 143 where fluorometric analysis was performed for uranium containing samples . . . .

The analytical results show that for an organic extractant containing 380 µg/ml of uranium there was a transfer of 280 µg/ml uranium to the aqueous phase from the organic extractant. The extractant, after stripping, contained 285 µg/ml. The other two tests on page 62 of Howerton's notebook, where divalent iron was not present in the strip solution, show a transfer to the aqueous of 0.038 and 7.0 µg/ml of uranium, using the same organic extractant of DEPA/TOPO obtained from Hurst's rig.

Crouse testified that he saw the results for Howerton's stripping tests . . . . :

> I recall the, the results, the general nature of the results; that is, not quantitatively, but I recall that, that in the case of the ferrous iron test, again he stripped much more uranium than would have been obtained with that same concentration phosphoric acid alone. The tests with hypophosphite were completely negative, just did not enhance the stripping efficienty [sic] at all, indicating that there was no reduction of uranium under these conditions.

Course analyzed the results during his testimony, and noted that for Howerton's test, where divalent iron was present in the phosphoric acid strip solution, 33% of the uranium was stripped from the extractant as against only 7.6% where divalent iron was not present.

We find that Howerton's tests satisfy every limitation of the count, were clearly successful, and therefore establish a reduction to practice on behalf of Hurst et al. on June 13, 1969.

Reese argues that only one of the three tests conducted by Howerton, test No. 3, involved use of ferrous ion in the stripping solution and, therefore, was not sufficient to constitute a reduction to practice because there is no evidence of record showing that either Hurst or Crouse considered the tests successful; further, that Hurst failed to establish that the tests met the count limitations.

In regard to Reese's first argument,[5] a "process is reduced to practice when it is successfully performed." *Hess v. Bland*, 52 CCPA 1641, 1648, 347 F.2d 835, 841, 146 USPQ 378, 382 (1965). We neither know of nor does Reese cite a rule of law or a reason for requiring a plurality of successful tests to establish actual reduction to practice.

---

5. Hurst admits that only test No. 3 is relied on to establish actual reduction to practice.

Reese's second argument, in effect, is twofold: (a) the relative ineffectiveness of stripping in Howerton's test No. 3 compared to various Reese tests; and (b) the assertion that "there is no corroborating evidence in the record that Hurst and Crouse even considered the test successful."

With respect to the comparative effectiveness of the Hurst and Reese tests, Reese relies on an affidavit of record, submitted by Wiewiorowski, which states that "the effectiveness of a stripping solution can be measured by the value of the stripping coefficient .... Stripping is effective if the stripping coefficient for the stripping system is greater than about 2.0 ...." Reese points out that Hurst's test No. 3 had a stripping coefficient of 0.98; whereas, the Reese stripping coefficients in Katz' runs 9–S, 10–S, and 11–S were 104, 1250, and 909 respectively, "thus demonstrating exceptional stripping." Reese also attacks Hurst's test No. 3 on the basis of a "concentration factor analysis"—the uranium concentration in the strip solution compared to that in the original wet-process acid. According to Reese, Hurst's test No. 3 had a concentration factor of only 1.65, although Hurst's patent has the stated objective of obtaining a concentration factor of from 70 to over 100; whereas, Reese's tests resulted in concentration factors of 270, 135, and 270 for Katz' runs 9–S, 10–S, and 11–S, respectively.

As to Hurst's failure to even consider their test successful, Reese points out that neither Howerton's formal notebook nor any other documentary evidence corroborating how the test results were analyzed, at or about the time the test was run, contains any suggestion that Hurst contemporaneously concluded that the test was successful.

■ We see no merit in either of these arguments. The test result itself shows that 33% of the uranium was stripped from the uranium-pregnant DEPA/TOPO solution when ferrous ion was present. Without the ferrous ion only about 7.6% of the uranium was stripped. Thus, the test itself

shows the successful reduction to practice, and the requirement set forth in *Hess, supra*, has been satisfied. A rule requiring that the tester or corroborator expressly state that the test data demonstrate success would elevate form over substance. Moreover, in establishing actual reduction to practice a party need only show that his invention successfully met the count limitations, not that it was more successful in obtaining a particular result than that of some other party. Although obtaining such results—if unexpected—may be crucial to the question of nonobviousness, that question is not before us because the nonobviousness of the subject matter of the count has presumptively already been determined as a prerequisite to declaration of the interference. Thus, the statement by Reese that their test results showed higher stripping coefficients and higher concentration factors is irrelevant.

Reese's further argument that test No. 3 fails to meet the count limitations is also twofold: (a) that the stripping solution used by Howerton does not satisfy the count, and (b) that HF in the stripping solution used by Howerton prevents the test from satisfying the count.

First, the count calls for "from about 40 to 100% by weight" phosphoric acid. Howerton used a 5 molar phosphoric acid stripping solution, which solution is 39.2% by weight phosphoric acid. Bearing in mind the broad range recited in the count, a concentration of phosphoric acid within .8% of 40 is clearly within the "about 40" lower limit of the count. Reese's contention that the "phosphoric acid concentration range of the count is critical in view of the dependence of the extraction coefficient [6] on phosphoric acid concentration" is not persuasive. The count merely requires "about" 40%, and Reese has provided no evidence to show that a 40% concentration is critical.

Second, the count does not recite the presence of HF in the stripping solution. Reese points out that Howerton was in-

---

**6.** The extraction coefficient is the inverse of the stripping coefficient discussed *supra*.

structed to include HF in the stripping solution and suggests that the count "should be construed to exclude the presence of flouride ion added as HF *in any quantity.*" The answer to this contention is that the count is a comprising-type count, which, by definition, does not exclude the presence of other steps, elements, or materials. *In re Fenton,* 59 CCPA 708, 451 F.2d 640, 171 USPQ 693 (1971); P. Rosenberg, *Patent Law Fundamentals* 14–15 (1980); 1 I. Kayton, *Patent Preparation & Prosecution Practice* § 3, at 2 (1976). Thus, in the absence of evidence of record showing that the presence of HF in the phosphoric acid stripping solution renders the process of the count inoperative, Reese's argument must fall.

Accordingly, we hold that the board correctly determined that test No. 3 conducted by Howerton established on June 13, 1969, actual reduction to practice of the count in '525.[7]

### B. Reese Actual Reduction to Practice

The board ruled that Reese failed to establish an actual reduction to practice of the invention on May 29, 1969, because of lack of corroboration. The board said:

For a pre-filing date of invention Reese et al. allege a corroborated conception in May of 1969 and an actual reduction to practice on May 29, 1969 .... Reese et al. further allege reasonable diligence in actually reducing the invention to practice from the date of the alleged conception until the date of the alleged actual reduction to practice.

*Pertinent Facts*

Reese is the president of URC, assignee of the involved Reese et al. application. Both he and his coinventor Katz have been involved with nuclear processing and chemistry for many years .... Reese's college education was in chemical engineering and Katz holds a doctorate degree in chemical engineering. In 1967, and during the times in question in this interference, Reese was a partner with the aforementioned Dr. Walton A. Rodger in Nuclear Safety Associates, which provided consulting engineering services in the nuclear industry.

Reese testified that he became interested in the recovery of uranium from wet-process phosphoric acid when he conducted an extensive investigation for W. R. Grace & Company (Grace) .... Reese's report to Grace was introduced into evidence as RX 50 and contemplates recovery of uranium according to a process developed in the 1950's using a different extractant from that of the present invention. According to Reese's testimony, when Grace elected not to proceed with the phosphoric acid uranium recovery project, he decided to pursue the project on his own ... and spent a substantial amount of time from July 1967 to the fall of 1968 on the project.

In August, 1968, Reese formed URC as the vehicle to commercialize his concepts for recovering uranium from wet-process acid .... He testified that after forming URC he needed technical assistance, including laboratory research facilities to perform bench scale testing of various facets of his recovery process, and that Katz was recommended for this purpose by Dr. Rodger .... Katz had recently joined the faculty at Howard University in the District of Columbia and had access to laboratory facilities. Katz's services were utilized by Reese beginning early in 1969 ....

Both Reese and Katz testified at length on the record as to how they conceived the invention of the count no later than May 14, 1969 when they merged their ideas. During his testimony, Reese drew flow sheets ... and explained the invention he and Katz allegedly conceived. Reese's description of the invention when considered in light of the flow sheets fully conforms to the invention defined by the count....

Dr. Rodger testified as a corroborating witness. During his testimony he drew a flow sheet ... and described an invention which he stated was disclosed to him by

---

**7.** Because of this holding, it is unnecessary to reach the issue involving Hurst's alternate proof of priority, *i. e.,* diligence from prior to Wiewiorowski's filing date to Hurst's filing date.

Reese and Katz on a date no later than the May 28, 1969 date of a letter . . . from Reese to Katz, a copy of which was sent to him. Dr. Rodger's testimony as to the invention disclosed to him fully conforms to the count in issue and establishes that Reese and Katz communicated the complete invention of the count to him no later than May 28, 1979 [sic 1969].

During the taking of his deposition, Katz testified with particularity as to experiments he had conducted during the month of May, 1969. He testified that these experiments were recorded in his notebooks, which notebooks were introduced into evidence . . . . Although the experiments as described by Katz fully conform to the count in issue, they were performed in secrecy by Katz alone, and the notebooks were not witnessed, signed or otherwise authenticated. Also, insofar as the record shows, no one ever saw Katz's notebooks until after the present interference was declared.

. . . .

Katz testified that in conducting his experiments he initially obtained a quantity of wet-process phosphoric acid and that he prepared a quantity of uranium-loaded water-immiscible organic extractant, namely, Ultrasene having dissolved therein di(2-ethylhexyl) phosphoric acid and trioctylphosphine oxide (DEPA/TOPO), by extracting uranium from the wet process acid with the quantity of DEPA/TOPO extractant. Katz testified that a sample of the wet-process acid as initially obtained and a sample of the uranium-pregnant DEPA/TOPO extractant were sent to Ledoux and Company ["Ledoux"] for analysis to determine the uranium content thereof . . . . Katz further testified that he stripped portions of the pregnant DEPA/TOPO extractant with concentrated phosphoric acid having an amount of divalent iron dissolved therein in excess of that necessary to reduce the $U^{+6}$ stripped from the DEPA/TOPO extractant to $U^{+4}$. A sample of each of the stripped portions of the DEPA/TOPO extractant was sent to Ledoux for analysis to determine the uranium content thereof . . . .

Katz stated that the stripping acid was thrown away. As to the results of the analyses performed by Ledoux, Katz testified that they established that the DEPA/TOPO extractant after stripping contained less uranium than before stripping, thereby proving that concentrated phosphoric acid having divalent iron dissolved therein would strip uranium from a DEPA/TOPO extractant. [Footnote omitted.]

. . . .

*Reduction to Practice*

The Reese et al. priority case, insofar as it concerns an actual reduction to practice, is defective for lack of corroboration.

For a junior party to prevail on the priority issues in an interference it is necessary for him to sustain his burden of proof and overcome with corroborated testimony the senior party's prima facie evidence of priority. *Rodin v. Spalding*, 49 [48] CCPA 870, 297 F.2d 256, 132 USPQ 285 (1962). The purpose of the rule requiring corroboration is to prevent fraud, *Berry v. Webb*, [56 CCPA 1272] 412 F.2d 261, 162 USPQ 170 (CCPA 1969); in the instant case, its purpose is to establish that Reese et al. successfully performed the process defined by the count in issue by proof that could not have been falsified, *Gianladis v. Kass*, 51 CCPA 753, 324 F.2d 322, 139 USPQ 300 (1963). The evidence necessary for corroboration is determined by the rule of reason. *Anderson v. Piper*, 58 CCPA 1221, 442 F.2d 982, 169 USPQ 788 (1971). When evaluating corroborative evidence of an actual reduction to practice, the record as a whole must be reviewed; the application of the rule of reason does not dispense with the requirement of independent corroboration. *Mikus v. Wachtel*, 542 F.2d 1157, 191 USPQ 571 (CCPA 1976).

For corroboration of the testimony of inventors Reese and Katz, Reese et al. rely on the testimony of Dr. Rodger and Stanton, the notebooks of Reese and Katz, certain correspondence between Reese and Katz,

and the sample analyses performed by Ledoux and Avco.[8]

As to the knowledge of Stanton and Rodger regarding Reese et al.'s actual reduction to practice, they knew only what they were told by the inventors. They neither participated in nor observed any of the Katz or Reese experiments. In this respect, it is pertinent to note that the Katz and Reese experiments were not carried out in the ordinary course of an organized and supervised program of research conducted over an extended period of time, *Grasselli v. Dewing*, 534 F.2d 306, 189 USPQ 637 (CCPA 1976); *Berges v. Gottstein*, [618 F.2d 771, 205 USPQ 691 (CCPA 1980)]. Rather, as noted above, the experiments were performed in secrecy by the inventors alone.

The inventors' notebooks are accorded no more weight than the inventors' testimony in this instance, since they were not witnessed or signed and were unseen by any witness until after this interference was declared.

With respect to the uranium-containing samples submitted by Katz and analyzed by Ledoux, and the sample submitted by Reese and analyzed by Avco, the analyses provide insufficient evidence to corroborate the testimony of Katz and Reese respecting their alleged reduction to practice. Nor do the analyses provide corroboration for the entries in the Katz and Reese notebooks, or otherwise authenticate those notebooks. In other words, the analyses of the samples do not provide corroboration of the inventors' notebooks or testimony that the process of the count was successfully performed. It is well settled that a process is not reduced to practice until it is successfully performed. *Hess v. Bland*, 52 CCPA 1641, 347 F.2d 835, 146 USPQ 378 (1965). All limitations of the counts must be satisfied, *Szekely v. Metcalf*, [59 CCPA 893], 455 F.2d [1393], 173 USPQ 116 (CCPA 1972); the rule of reason regarding corroboration does not dispense with this rigid requirement of the law. Neither Ledoux or Avco was informed as to

the process by which the samples were prepared, nor were they able to tell from the sample analyses. For all the record establishes by independent corroboration, the samples could have been produced by another process, e. g., a process wherein reduction of the $U^{+6}$ in the stripping solution was by electrolysis, or the uranium-containing DEPA/TOPO extractant samples submitted for analysis might have been subjected to no stripping step at all.

Reese et al. argue that the consistency of the evidence corroborates the testimony of Reese and Katz that the invention was actually reduced to practice on the dates alleged. However, we do not find such consistency. As we found above, the Reese et al. parent application fails to disclose the invention of the count. Therefore, consistency is lacking between the parent application and the other evidence of an actual reduction to practice submitted by Reese et al. *Mikus v. Wachtel*, supra.

We have fully considered all the evidence submitted by Reese et al. In support of their case for priority, including the exchange of correspondence between the inventors Reese and Katz, but have found insufficient corroboration of the inventors' testimony to establish that they actually reduced the invention to practice on the dates alleged. With respect to the Reese-Katz letters of August 2 and 6, 1969 ... which were read and understood by Dr. Rodger, they fail to corroborate the experiments allegedly performed by Katz. Rodger had no first hand knowledge that Katz performed the experiments described in the letters. Insofar as the record shows, Rodger was never in Katz's laboratory, nor did he ever see Katz perform any experiment. Therefore, we do not find the rule of reason, as regards corroboration, applicable in this instance. *Grasselli v. Dewing*, supra.

Reese argues that the board erred in its decision concerning the experiments by Katz conducted on May 28 and 29, 1969, asserting that these experiments were actu-

8. The analyses performed by Avco Corporation ("Avco") relates to the tests conducted by

Reese on August 3, 1969, *supra* note 1.

al reductions to practice of the count and that letters, testimony, and the entire context of actions taken by Katz, Reese, Rodger, and employees of Ledoux provide sufficient corroboration.

(1) *Corroboration Standard of Patterson v. Hauck*

In regard to corroboration, Reese contends that under the standard applied in *Patterson v. Hauck*, 52 CCPA 987, 341 F.2d 131, 144 USPQ 481 (1965), their evidence is sufficient to corroborate Katz' tests. In *Patterson* this court held that corroboration was sufficient where Dorst, the inventor's supervisor, had told Lissner, the inventor, to take specific known materials and work out a better process for using them, which the inventor did. The process was carried out using these materials, and Dorst saw the product of the improved process and testified about its characteristics. Here, Reese argues that Rodger corroborated Katz' experiments just as Dorst was held to have corroborated Lissner's work in *Patterson*. This argument is unpersuasive for two reasons. First, in *Patterson*, Dorst periodically reviewed actual products prepared by the improved process; whereas, in the case before us Dr. Rodger's exposure to the result of the process was dependent *solely* on various communications from Katz, *viz.*, discussion at a luncheon meeting on June 9, 1969, and an August 2, 1969, letter from Katz. In *Patterson* it was the actual periodic review of the results of the process by Dorst in conjunction with other corroborating evidence which was persuasive. Here Dr. Rodger never saw the results of the Katz experiments, never participated in those experiments, and, as of June 9, 1969, had not seen Katz' notebook. Second, in his testimony Dr. Rodger expressed doubts concerning the results reported to him at the luncheon meeting. Concerning the test results and actual presence of Katz' notebook at the June 9, 1969, luncheon meeting, Dr. Rodger testified:

Q. Do you recall whether Dr. Katz brought his laboratory notebook to the meeting?

A. [Dr. Rodger.] I do not recall that. I rather think he did not, but I have not been able to satisfy myself on that point to be able to say that he did. I think he did not.

Q. Okay. What did Dr. Katz tell you and Mr. Reese at that meeting regarding the tests, the stripping tests, that he had carried out?

A. Well, he reported successfully stripping uranium from the organic with concentrated phosphoric acid and with concentrated phosphoric acid loaded with, as I remember it, in the range of 25 to 50 grams per liter of uranium containing iron as a reducing agent. He based his conclusions at that point on color change, and the color change was in the organic. You can't tell from the color change in the aqueous because the iron itself obscures the color change, but he was satisfied that he had demonstrated the stripping with these reducing conditions, and my recollection is that both he and Mr. Reese were enthusiastic that they had demonstrated their point.

I have always been somewhat more conservative, and while I agree that the color change was an indication that they had achieved what he said, I seem to remember cautioning that I would personally be happier when I saw some analytical results.

We are not persuaded by Reese's contention that "Rodger's review . . . of Ledoux's analyses set forth in Katz' August 2, 1969, letter . . . to Reese . . . is the legal equivalent of Dorst's physical inspection in *Patterson*." Apart from the deficiencies in the Ledoux analyses, discussed *infra*, the substance of this contention is that Dr. Rodger testified that he believed the analytical results substantiated that Dr. Katz had observed a "color change," thus:

Q. Did you discuss with Mr. Reese at the time you saw Dr. Katz's letter and Mr. Reese's retyping of it, Reese Exhibits 68 and 91, respectively, the analytical results reported in Dr. Katz's letter?

A. I am sure that I did. It's hard to have the specific recollection of exactly

what went on at that time, but I am sure I looked those results over with Mr. Reese.

Q. Do you have a recollection as to what your reaction to the analytical results was?

A. Yes. My recollection is that two of the results had indeed substantiated what he had said, and the third one did, too, if one made some assumptions concerning some errors in the analysis. I was somewhat more upset, I think, than Mr. Reese of the necessity of having to make those assumptions with the third run, but I believe that I agreed that, yes, this did substantiate what they had observed.

Q. What he had observed?

MR. LUPO: I move to strike the last part of that answer since the witness has no way of knowing factually what they observed. He only has knowledge of what they reported to him.

THE WITNESS: What they reported to me.

BY MR. JACOBSON:

Q. Yes. I was just going to ask you what you meant by "they observed" in your answer.

A. *What they reported. What Dr. Katz reported to me and to Mr. Reese that he had, that he, Dr. Katz, had observed.* [Emphasis added.]

Q. All right. And this is what you have testified about as being reported in the June 9th, 1969 meeting?

A. Yes. The color change.[9]

Like the knowledge Dr. Rodger gained from the June 9, 1969, luncheon meeting with Dr. Katz and Dr. Reese, the knowledge he gained (*i. e.,* that Katz actually performed experiments meeting the count and

observed the color change) from reading the August 2, 1969, letter failed to corroborate an actual reduction to practice because it was dependent solely on what Katz told him.

(2) *Weight Accorded Katz' Notebook and Reese/Katz Correspondence*

Reese argues that the "fact that Katz' notebook is not witnessed or signed is not critical" because there is testimony about who made the entries in the notebook, Rodger reviewed Reese's May 28, 1969, and August 2, 1969, letters, and Rodger was kept apprised of the direction and results of the research program carried out by Katz. Like the board, we are not persuaded by these arguments, because they overlook the fact that the essential corroboration of actual procedures followed and results obtained by Katz is dependent solely on Katz. That "Katz had no incentive to report to Reese and Rodger tests which were not actually conducted" goes to the weight of the evidence in a rule of reason analysis, but does not satisfy the need for corroboration that is not dependent solely on Katz, as required even under the rule of reason. *Mikus v. Wachtel, supra.*

(3) *Consistency of Record as a Whole*

Reese's argument that their record, "when considered as a whole, is internally consistent as to both time and events," is without merit. In aid of this argument Reese lists a number of events and decisions generally supportive of Reese's testimony that Katz performed tests with wet-process phosphoric acid and DEPA/TOPO extractant solutions during March to June 1969. However, this falls short of corroboration of the limitations of the count in interference. There is no dispute that in early 1969 Reese

---

**9.** Even taken as true, the mere existence of such color change did not satisfy Reese's burden of proof. Reese does not dispute that there are other explanations (pointed out by Hurst and Wiewiorowski) for this color change. The characteristic color of $U^{+6}$ is yellow while that of $U^{+4}$ is green. Dr. Wiewiorowski testified that "Katz completely ignored yellow substances other than $U^{+6}$, e. g., humic acids, which were also present during his experi-

ments" and that "Reese's own laboratory work shows that similar color changes occur when pregnant DEPA/TOPO is contacted with 85% $H_3PO_4$ loaded with $U^{+6}$, without iron reduction." Dr. Rodger's testimony appears to go only to the question of the existence of the color change, not to establishing that the color change was the result of reduction of $U^{+6}$ to $U^{+4}$.

was engaged in research to improve uranium extraction from wet-process phosphoric acid solution. The issue has to do with the particular limitations of the count in interference. In a lengthy list of citations to the record, Reese fails to relate any of them to specific limitations of the count in interference.

## (4) Ledoux's Analyses as "Corroboration"

Samples of Katz' tests 9–11 were analyzed by Ledoux. Reese argues that, contrary to the board's finding, the "analyses unquestionably corroborate entries appearing in Katz' notebook." Reese points out that "the time frame of Ledoux's analyses dovetails precisely with the entry dates appearing in Katz' notebook" and that "the type of materials analyzed by Ledoux are the same as Katz used in his tests." The critical defect in Reese's argument is the failure to link the analyses conducted by Ledoux to all the limitations of the count in interference. As pointed out by the board, *supra*, Ledoux was not told, nor . could a determination be made, of the process by which the samples were prepared.[10]

## (5) Additional Documents and Oral Testimony as "Corroboration"

Reese contends that a number of other documents corroborate Katz's May 1969 tests. These include various correspondence among Reese, Rodger, and Katz; correspondence between Katz and Ledoux; Reese's own notebook; Ledoux's billing records and reports of analyses; and Reese's patent disclosure. We see no merit in the contention, because all corroborative information contained in such documents relevant to actual reduction to practice of the count is dependent on information available solely from Katz. There is no relevant information that was generated independently.

**10.** Reese also overlooks evidence that severely undercuts, if not destroys, any corroborative value of dovetailed timing and identity of materials. For example, Reese, himself, wrote to Katz regarding Ledoux's analyses in a letter dated July 16, 1969, and indicated that he did not see how Ledoux could expect payment "for results that are meaningless." The record before us contains numerous letters among Katz,

## (6) Failure of Reese's Parent Application to Support the Count

The board determined that Reese's parent application does not disclose the invention of the count in interference. This issue involves the question of whether at least some of the $Fe^{+2}$ is in the stripping solution when it comes in contact with the organic extractant and whether the Reese parent application supports such a count interpretation.

The board said:

Where an applicant alleges he is entitled to rely upon a previously filed application under 35 USC 120, the parent application must comply with the first paragraph of 35 USC 112. *Swain v. Crittendon*, 51 CCPA 1459, 332 F.2d 820, 141 USPQ 811 (1964); *Fontijn v. Okamoto*, 518 F.2d 610, 186 USPQ 97 (CCPA 1975). The parent application must clearly support the counts. Cf. *Jepson v. Coleman*, 50 CCPA 1051, 314 F.2d 533, 136 USPQ 647 (1963). Every limitation of a count is material. *Storchheim v. Daugherty*, 56 CCPA 1147, 410 F.2d 1393, 161 USPQ 679 (1969). Where support is based on an inherent disclosure, it is not sufficient that a person following the disclosure might obtain the results set forth in the counts, it must invariably happen. *Gubelmann v. Gang*, [56 CCPA 1013], 408 F.2d 758, 161 USPQ 216 (CCPA 1969).

The sole issue raised by the parties on the question of benefit is whether or not the parent Reese et al. application provides support for the following subject matter:

. . . stripping the extractant with an aqueous phosphoric acid solution . . . having dissolved therein divalent iron.

It is our opinion that the only reasonable interpretation of this limitation, when read

Reese, and Ledoux employees detailing problems with the samples submitted by Katz and the analyses performed by Ledoux. Even assuming that each count limitation could have been corroborated by analyses of the type made by Ledoux, the evidence clearly shows that no meaningful results were obtained from these analyses.

in the context of the remaining count language, requires that at least some divalent iron be present in the phosphoric acid stripping solution when the stripping solution comes into contact with the uranium-containing organic extractant. Contrary to the arguments of Hurst et al. and Wiewiorowski et al., we do not read the limitation as requiring the presence of divalent iron in the stripping solution *during* contact (i. e., all the time during contact) of the organic and acid phases. Regardless of which way the limitation is interpreted, however, we do not find that the Reese et al. parent application provides a disclosure supporting the subject matter defined thereby, either expressly or inherently. In the Reese et al. disclosure, divalent iron is provided in the strip solution to reduce the $U^{+6}$ in the solution to $U^{+4}$ *after stripping*. There is no disclosure that the reduction *after* stripping provides the recycled strip solution with divalent iron in excess of that required to reduce all the $U^{+6}$ in the strip solution to the $U^{+4}$ valence state. Rather, we are of the opinion that the Reese et al. disclosure teaches away from utilizing a strip solution having excess divalent iron dissolved therein. Reese et al. teach the use of concentrated phosphoric acid as a strippant, and teach the use of divalent iron merely as a means to increase the uranium-loading capacity of the strippant.

Reese et al. contend that the following three paragraphs bridging pages 11 and 12 of the parent application provide support for the count:

It has also been found that in instances where the extraction coefficient ($E_a^o$) in the stripping stage is lower for uranium in the quadrivalent state than it is for uranium in the hexavalent state, the concentration of total uranium in the stripping concentrated phosphoric acid solution can be increased over and above the original content of hexavalent uranium first extracted from organic extractant by reducing the uranium in the stripping solution to the quadrivalent state and then recycling the stripping solution to contact it with fresh organic extractant containing hexavalent uranium. In this manner the total uranium content of the stripping solution is enhanced by the addition of the $U^{+6}$ picked up from the fresh organic extractant as well as the $U^{+4}$ present from the original stripping operation. An obvious advantage of the increased total uranium concentration of the stripping solution is the reduced volume of stripping solution that must be processed to separate a given quantity or uranium from the stripping solution.

This reduction of the hexavalent uranium may be carried out by the addition of reducing agents such as ferrous ion or iron metal. An even more desirable method of reducing uranium in the hexavalent state to the quadrivalent state in phosphoric acid involves the use of electrolysis. It has been found that this reduction proceeds very well and essentially to completion in conventional electrolytic cells.

An obvious advantage of electrolytic reduction is that no contaminating agents need be added to the stripping solution. A further advantage is that the viscosity of the stripping solution remains much lower when it is not loaded with reducing agents, which permits more efficient contacting with the organic. It has also been found that the uranium concentration in the stripping solution may be limited by the limits of solubility of reducing agents and this limitation is avoided when the reduction is performed electrolytically.

In considering the above three paragraphs, we note that the first paragraph discloses *at most* a reduction of *all* the $U^{+6}$ in the stripping solution to $U^{+4}$ *after* the solution has stripped the $U^{+6}$ from the extractant.

The second paragraph discloses the use of reducing agents such as ferrous ion or iron metal for reducing the $U^{+6}$ in the strip solution; however, the paragraph states that a more desirable way to reduce the $U^{+6}$ to $U^{+4}$ is by electrolysis. Reduction of $U^{+6}$ to $U^{+4}$ by electrolysis does not produce divalent iron in the strip solution. Therefore, the second above-quoted paragraph

fails to disclose divalent iron in the strip solution. In fact, Reese et al. state in the last sentence of the paragraph that the reduction proceeds "essentially" to completion in conventional electrolytic cells, which indicates there is no need, when practicing the Reese et al. process, to reduce *all* the $U^{+6}$ to $U^{+4}$ in the strip solution. Nowhere in the Reese et al. application has it been specifically stated that *all* the $U^{+6}$ in the strip solution is reduced to $U^{+4}$.

The third paragraph in our view clearly teaches away from using reducing agents in the strip solution. To any extent that the paragraph does teach the use of reducing agents, our view is that it teaches using less, not more, than enough reducing agents to reduce all the $U^{+6}$ to $U^{+4}$, because reducing agents are said to contaminate the strip solution. In any event, there is no disclosure in the paragraph to strip with a strip solution loaded with divalent iron. Reese et al. argue that the sentence, "A further advantage is that the viscosity of the stripping solution remains much lower when it is not loaded with reducing agents, which permits more efficient contacting with the organic", is an inherent disclosure of divalent iron in the strip solution during stripping. Such an interpretation would be out of context, and clearly inconsistent with the meaning of the other language in the Reese et al. parent application, which discloses at most only a sufficient amount of divalent iron in the strip solution to reduce all the $U^{+6}$ to $U^{+4}$.

The Reese et al. argument, based on the expert testimony of Dr. Walton A. Rodger, that the addition of a stoichiometric amount of iron reducing agent to the strip solution would necessarily result in excess divalent iron is unpersuasive. A stoichiometric amount of iron is that amount necessary to reduce the $U^{+6}$ in the strip solution to $U^{+4}$; therefore, the addition of such an amount could not result in excess divalent iron. Moreover, the Reese et al. parent application fails to disclose the addition of stoichiometric amounts of reducing agents to the strip solution; it does not mention the word "stoichiometric". As we have found above, the Reese et al. parent application

discloses at most a reduction of all the $U^{+6}$ in the strip solution to $U^{+4}$.

. . . .

In view of the above, Reese et al. are not entitled to rely on their parent application filed on December 5, 1969 in this interference, and therefore their effective filing date is December 2, 1970.

In reviewing the board's opinion, we begin with the well-settled proposition that an interference count must be given the broadest interpretation that it will reasonably support, *Fontijn v. Okamoto*, 518 F.2d 610, 617, 186 USPQ 97, 102–03 (CCPA 1975); *Buck v. Desvignes*, 489 F.2d 737, 740, 180 USPQ 193, 196 (CCPA 1973). The involved count limitation expressly requires "stripping" with a solution "having dissolved therein divalent iron." Since the stripping solution contains the reducing agent, both reactants are present at the same time in the same container to perform their separate functions. Reese argues that this interpretation is incorrect because the "count only requires that $Fe^{+2}$ achieve the reduction of $U^{+6}$ to $U^{+4}$ and that there be 'reductive stripping.' " However, this ignores the plain language of the count. Reese also argues that certain terminology in the Hurst application supports the proposition that the count encompasses sequential stripping and reducing. However, it is improper to resort to the specification from which a count originated to construe the count unless it is determined to be ambiguous. *Fontijn v. Okamoto*, 518 F.2d at 618, 186 USPQ at 103; *cf. Henderson v. Grable*, 52 CCPA 920, 926, 339 F.2d 465, 470, 144 USPQ 91, 96 (1964). Moreover, the court does not look to the specification to determine whether there is an ambiguity. *Kroekel v. Shah*, 558 F.2d 29, 194 USPQ 544 (CCPA 1977); *Stansbury v. Bond*, 482 F.2d 968, 179 USPQ 88 (CCPA 1973).

Reese further argues that under the "gist of invention" test set forth in *Hall v. Taylor*, 51 CCPA 1420, 1424, 332 F.2d 844, 848, 141 USPQ 821, 824 (1964), the parent application supports the count. In *Hall*, relative to a count that specified various ranges in

several count limitations, this court said that—

> it is futile merely to compare *quantitatively* range limits and numbers set out in counts with range limits and numbers disclosed in an allegedly supporting specification. Closer scrutiny is required to get at the essence of what invention the count purports to define.

Here the question of merely comparing ranges to determine overlap is not presented. Rather, the gist of the invention concerns the timing of the stripping and reducing steps, *i. e.*, whether at least some $Fe^{+2}$ is present for reduction in the stripping solution when the stripping solution comes in contact with the organic extractant, or whether the two steps may occur sequentially. As pointed out by the board, *supra*, Reese's parent application fails to support the timing required by the count and, therefore, does not include the essence or gist of the invention defined by the count. Accordingly, we conclude that the board correctly determined that Reese's parent application fails to support the count in '525.[11]

In view of the foregoing, we hold that Hurst established an actual reduction to practice on June 13, 1969, and that Reese failed to prove their alleged actual reduction to practice on May 29, 1969.[12] Because Wiewiorowski took no testimony to establish a prefiling date of invention, the board's award of priority in '525 to Hurst was correct.

### The '526 Appeal

For the purpose of our review, the only differences between the '526 appeal and the '525 appeal are that Wiewiorowski is not a party in '526 and that the count language is somewhat different.

The important difference in the count in '526 is presence of the phrase "reductively stripping." Reese argues that the scope of this count includes sequential stripping and reducing because both the Hurst and the Reese specifications support that interpretation. This ignores the plain language of the count in which the phrase "reductively stripping" is modified by what follows, *viz.*, the reductive stripping is carried out "with a strip solution in which ferrous ion is used to reduce uranyl ions in the extractant to uranous ions in the strip solution." This requires the ferrous ion to be in the strip solution and, as related earlier regarding the count in '525, defines a condition wherein at least some reduction and stripping occurs *simultaneously*. Whatever significance other differences between the count in '525 and the count in '526 may have had during the respective interferences, such differences are immaterial to resolution of the question of priority on this appeal.[13] Accordingly, we hold that the board correctly awarded priority of the count in '526 to Hurst.

### The '527 Appeal

In '527 the issue is whether Reese has antedated Wiewiorowski's filing date of July 2, 1970, with either an actual reduction to practice on May 29, 1969, or a constructive reduction to practice with the filing date of the parent application, December 5, 1969. In view of our conclusion and holding in '525, it follows that the board was correct in awarding priority in '527 to Wiewiorowski. Accordingly, it is unnecessary to address the fraud allegation by Wiewiorowski.

AFFIRMED.

BALDWIN, Judge, concurring.

I agree that the evidence amassed by appellants is deficient, as the majority opin-

---

11. Such failure renders irrelevant Reese's argument that their corroborative proofs are consistent.

12. Because Reese's parent application fails to support the count and, therefore, was not a constructive reduction to practice, we do not reach the issues of whether Reese was diligent from their date of conception, May 28, 1969, to the filing date of the parent application, December 5, 1969, and whether Reese derived the

invention from Hurst. Even if Reese had derived the invention from Hurst, as argued by Wiewiorowski, Hurst still proved actual reduction to practice prior to Wiewiorowski's filing date.

13. Hurst points out that "[i]t is now and has always been the position of Hurst that the two interferences ['525 and '526] involve the same legal issues and factual proofs . . . ."

ion suggests, in substantiating an actual reduction to practice. But I feel the majority improperly derogates the evidentiary significance of the Katz notebook. In particular, I believe the majority misapplies the law by concluding that the fact "[t]hat 'Katz had no incentive to report to Reese and Roger tests which were not actually conducted' goes to the weight of the evidence * * *, but does not satisfy the need for corroboration that is not dependent solely on Katz, as required even under the rule of reason."

### Corroboration Requirement

The majority follows the board in effectively according no weight to the Katz notebook as "independent corroboration" of an actual reduction to practice by appellants before July, 1970. Averring to *Mikus* and *Thruston*, the majority justifies its position by stating that the requirement for "independent corroboration" remains unaltered by the court's adoption of the "rule of reason," and may be satisfied by "evidence of surrounding facts and circumstances independent of information received from the inventor." However, before this distillation of legal doctrine is accepted on face value and applied to the present facts, we would do well to seek some perspective on the origin and purpose of the corroboration requirement as interpreted under the rule of reason.

The need for corroboration in priority cases was enunciated early on in *Mergenthaler v. Scudder*, 11 App.D.C. 264 (1897). While often cited for its definition of conception, the *Mergenthaler* decision also considers the quantum of proof sufficient to demonstrate conception, stating that:

The fact of conception by an inventor, for the purpose of establishing priority, can not be proved by his mere allegation, nor by his unsupported testimony, where there has been no disclosure to others or embodiment of the invention in some clearly perceptible form, such as drawings or model, with sufficient proof of identity in point of time. For otherwise such facile means of establishing priority

of invention would, in many cases, offer great temptation to perjury, and would have the effect of virtually precluding the adverse party from the possibility of rebutting such evidence. Hence it has been ruled in many cases that the mere unsupported evidence of the alleged inventor, on an issue of priority, as to the fact of conception and the time thereof, can not be received as sufficient proof of the fact of prior conception. [11 App. D.C. at 278.]

In *Petrie v. De Schweinitz*, 19 App.D.C. 386 (1902), the D.C. Court of Appeals adopted its own reasoning from *Mergenthaler* to rationalize a corroboration requirement in an interference that, like the one before us, involved a process invention. The junior party-appellant in *Petrie* testified to actually reducing to practice a process for improving "tobacco of inferior quality," but the Commissioner found appellant's evidence unpersuasive, stating that:

The testimony of the witness as to what Petrie told them he was doing or intended to do may be taken as showing that he had a conception of the invention at that time, but it cannot be accepted as showing a reduction to practice. Petrie himself is the only one who testifies to an actual performance of the process of the issue. None of the others saw it, and all that they know of it was derived from Petrie's statements. The testimony of these witnesses does not corroborate Petrie's present statement that he successfully performed the process, and his unsupported statement to that effect is insufficient to establish the fact. From the nature of the invention, the result of his experiments performed in secret could not be preserved to show what was done and whether or not it amounted to a reduction to practice of the invention, and his present statement of his conclusion that his experiments were successful and constituted a reduction to practice of the invention is not capable of being rebutted any more than would be the statement of an inventor as to his conception. Considering the natural bias of a party and the incentive to color the testimony

in his own interest, it has been repeatedly held that the unsupported testimony of the inventor is insufficient to establish facts of this kind.

19 App.D.C. at 388–389.[1] The court fully concurred in the Commissioner's analyses, concluding that:

> The evidence of self-serving declarations concerning an invention, whilst admissible as disclosures tending to establish the fact of conception, are clearly incompetent to prove the independent fact of reduction of that conception to practice.

It is worth emphasizing, however, that the "self-serving declarations" mentioned in the court's opinion were alleged statements by appellant that several witnesses testified he had made to them regarding "what he had done or was doing in the way of practicing and perfecting his process * * *." 19 App. D.C. at 388. In particular, appellant in *Petrie* presented no contemporaneous documentation of his work, such as an experimental notebook, so that the testimony as to appellant's statements was offered for the truth of those statements, i. e., as hearsay evidence that appellant's experimentation amounted to a reduction to practice within the limitations of the counts.

The language, if not the rationale, of the *Petrie* decision was employed by this court in *Kear v. Roder*, 28 CCPA 774, 115 F.2d 810, 47 USPQ 458 (1940), where appellant in an interference over the invention of an aircraft radio guidance system sought to prove a prior reduction to practice via third-party testimony and references to appellant's notebook and time cards from the relevant period. The *Kear* court, requiring "independent corroboration," discounted both testimony and documentation as based, in part or in whole, on information derived from appellant, and specifically characterized the latter evidence as "merely self-serving declarations of appellant, they having been made by him." 115 F.2d at 817, 47 USPQ at 466. The excerpt from *Petrie* quoted above was cited by the *Kear* court in support of its lending no evidentiary weight to appellant's laboratory notebook, despite the fact that *Petrie* dealt with testimony from memory of statements, supposedly made thirteen years earlier, that provided little detailed information concerning an alleged reduction to practice.[2]

Seven years later, the ruling in *Kear* was reiterated in *Thurston v. Wulff*, 35 CCPA 794, 164 F.2d 612, 76 USPQ 121 (1946), a case relied upon by the majority here. In *Thurston*, the board had concluded that deposition testimony by witnesses called on behalf of Thurston, the junior party, was insufficient *as a matter of law*[3] to substantiate an actual reduction to practice. Apparently unable to meet the board's substantive objections, Thurston argued on appeal that *no* corroboration of his own testimony was necessary, since:

> [I]n well-conducted, large laboratories such as the one involved in the case at bar and in other well-operated business establishments where well-kept books and records are prepared and complete data

---

1. Like the junior party in *Petrie*, appellants in the present case seek to prove a reduction to practice of a process, the results of which yield no tangible end product to "be preserved to show what was done." Appellants are also said to have researched "in secret," and it is apparently true that URC in 1969 did not have a systematic procedure for disseminating basic research data throughout a diverse corporate hierarchy. Be that as it may, one can hardly characterize Katz's work as other than "an organized and supervised program of research" —Katz was, after all, hired by URC to do specific experiments, with a particular goal in mind, using funds provided Howard University under a formal grant from URC.

2. The *Kear* court also relied on *Collins v. Olsen*, 26 CCPA 1017, 102 F.2d 828, 41 USPQ 220 (1939). However, the documentation offered by appellant (and rejected by the court) as corroboration in *Kear* took the form of reports by appellant to his superior concerning successful testing of a new gelatin mixture. Characterized as "self-serving" by the court, the test reports in *Collins* are nevertheless clearly distinguishable, from the standpoint of reliability, from the sort of contemporaneous record of experimentation as was summarily discounted in *Kear*.

3. More specifically, the board in *Thurston* found appellant's evidence regarding the identity of a newly-synthesized compound to be defective.

on experiments properly compiled and filed there is not much opportunity for fraud being perpetrated and that, under such circumstances, there is little likelihood that the inventor's testimony would involve perjury. [164 F.2d at 617, 76 USPQ at 126.]

However, the court declined Thurston's invitation to abrogate the corroboration requirement, stating in dictum that:

An inventor's testimony * * * might be corroborated by facts and circumstances other than by an independent witness. Such proof or evidence should be independent of the testimony of the inventor and should not consist of *self-serving documents prepared by him or under his direction,* nor should it be based upon facts the truth of which depends upon information received from the inventor.

*Id.* (Emphasis added.) Thus, between *Petrie* and *Thurston,* there occurred, largely without critical analysis, a progression in judicial pronouncements regarding the corroboration of an actual reduction to practice. We proceed from a rejection, as corroborating evidence, of unverifiable testimony recalling oral communications from over a decade earlier (*Petrie*) to an *ab initio* denial of weight to a research notebook, i. e., a contemporaneous *document,* without any reasoned consideration of the circumstances bearing on the authenticity or reliability of the document (*Thurston*).

### The Rule of Reason

I submit that the mechanical disposition of the evidentiary issues presented by appellant's notebook in *Thurston,* and by Katz's notebook in the present case, is inconsistent with the "rule of reason," as promulgated by us on a case-by-case basis. In accordance with this general approach to evidentiary analysis, the goal of corroboration "is simply to establish that the inventor actually [reduced the invention to practice] and knew it would work, by proof that could not have been fabricated or falsified. All the evidence must be considered in determining whether * * * appellant has met such requirement." *Gianladis v. Kass,* 51

CCPA 753, 324 F.2d 322, 139 USPQ 300, 303 (1963).

In particular, thorough consideration of all circumstances reflecting on the reliability of documentary evidence is deemed obligatory under the rule of reason; factors other than mere authorship of a proffered document by a party in interest must be weighed. For example, in *Berry v. Webb,* 56 CCPA 1272, 412 F.2d 261, 162 USPQ 170 (1969), the court was confronted with witnessed pages from an inventor's lab notebook, offered by appellant Berry as corroboration of an alleged reduction to practice of certain new types of crystalline x-aluminum oxide which were the subject of interference counts. The board had rejected as uncorroborated the claim by Berry that his crystals were of the width specified by a count, on the ground that Berry's evidence on this point was "a report or notes by the inventor," i. e., Berry's research notebook.

The court in *Berry* disallowed the board's reasoning as follows:

The purpose of the rule requiring corroboration is to prevent fraud. Keeping that purpose in mind, we examine the facts of record in the present appeal. Berry's notebook is a contemporaneous record of his thoughts and actions during the performance of an organized research endeavor. What incentive, one may ask, would there be to falsify the observations regarding the dimensions of the crystals produced by the experiments? Surely, it would not be reasonable to imagine that Berry had in mind, at the time he recorded the experiments' results, this interference with its limited counts. Moreover, Berry's laboratory partner, Simmons, testified to having observed the experimental work being performed, understanding the recorded results, and witnessing the notebook records. This establishes that the notebook was in existence and properly kept at the time alleged. To require more corroboration than that set forth above would not, in our view, serve to dispel the possibility of fraud to any significantly greater extent than has already been done in this instance, and would rather appear only to lead to an unjust result.

412 F.2d at 267, 162 USPQ at 174. The points of departure for the analysis of the *Berry* court warrant emphasizing: first, any motivation for appellant to shade the results of his experiments recorded years before the present controversy is discounted; second, the signature of a witness who understood the *recorded* results is relied upon as evidencing the *authenticity* (not the accuracy) of the notebook's contents.[4]

I consider the reasoning in *Berry* regarding the adequacy of an inventor's notebook

4. Compare our rationale for denying corroborating weight to an unwitnessed notebook in *Gortatowsky v. Anwar*, 58 CCPA 1266, 442 F.2d 970, 170 USPQ 41, 43 (1971):

In this case * * * we do not see how the laboratory notebook of Gortatowsky could be said to provide the necessary corroboration. In particular, it is noted that *the notebook pages were not read and witnessed by anyone. In addition, Gortatowsky testified that he only attempted to keep his notebook entries in chronological order "to a degree"* and that it was his practice at times to leave blanks in the notebook which might be filled in at a later date. *Thus, there isn't even adequate evidence here that the notebook itself was in existence and properly kept at the time alleged,* let alone sufficient evidence in the notebook itself to in turn corroborate Gortatowsky's testimony. We, therefore, conclude that the board was correct in holding that Gortatowsky's proof of reduction to practice fails for lack of proper corroboration. [Emphasis added.]

5. Also noteworthy in this vein is the rationale used by this court in *Anderson v. Pieper*, 58 CCPA 1221, 442 F.2d 982, 169 USPQ 788, 790 (1971), to justify accepting as corroborating evidence notebook entries, concerning the analysis of a new compound, where the entrant, an associate of the co-inventors Anderson and Truett, had died by the time of trial:

We agree with Anderson that application of the rule of reason in this case compels the conclusion that the notebook entries of Merckling [the deceased] corroborate the inventors' testimony that a solid polymer was produced. *The entries were thoroughly authenticated,* a complete foundation for admissibility was laid, and the entrant was unavailable to testify. *The circumstances surrounding the making of the entries are in this case convincing as to reliability* of the entries for their truth. [Emphasis added.]

6. *Ritter* was distinguished by this court on its facts only in *Frilette v. Kimberlin*, 56 CCPA 1242, 412 F.2d 1390, 162 USPQ 148 (1969).

as corroborative evidence to be exemplary of the sort of evidentiary analysis which is appropriate under the rule of reason.[5] A very similar line of reasoning can be traced in *Ritter v. Rohm & Haas Co.*, 271 F.Supp. 313, 154 USPQ 518 (S.D.N.Y.1967), where corroboration of an alleged conception was at issue.[6] See also *Cleeton v. Hewlett-Packard Co.*, 343 F.Supp. 1215, 173 USPQ 534, 539–541 (D.Md.1972). The relevant portions of Judge MacMahon's persuasive exposition in the *Ritter* decision are reprinted in the margin.[7]

7. Defendant asserts that Ritter's notebook is of no evidentiary value, regardless of how persuasive it may be, because it is a "self serving" document and not the "independent corroboration" the law demands. We note at the outset that this is different from defendant's legal contention at the pre-trial conference (January 27, 1967 Tr. 13–14). There is no question that Ritter's oral testimony, standing alone, is insufficient to prove conception. The notebook is the only corroborative evidence introduced by plaintiff; if it is legally insufficient to establish corroboration, Ritter cannot prove an invention date prior to the French patent, and his patent is invalid.

We have found no case in this circuit expressly dealing with the nature of the corroborative evidence required. Decisions elsewhere are split. Some rigorously demand "independent" evidence; any documents prepared by, or under the supervision of, the inventor are "self serving" and cannot provide corroboration. Others stress that it is the oral *testimony* of the inventor which must be corroborated, and this can be done by any means, including the use of diaries, notebooks, and records prepared by the inventor, as long as this evidence is "clear and convincing."

We are disinclined to rely on quantitative rules of evidence in our search for truth. Their appeal of simplicity is outweighed by the vice of blindness. Rather, we look to the purpose behind the rule requiring corroboration for guidance in its application. The manifest purpose of the rule is to prevent fraud. When the validity of a patent turns on the exact date a certain event occurred, or discovery was made, there is an inherent risk of perjury if after-the-fact oral testimony by the most interested party, the alleged inventor, can carry the invention date back beyond the filing date.

In light of that purpose, it would be absurd to hold that Ritter's notebook is not sufficient corroboration, but that "independent" evidence of his conception date is required. The

### Conclusion

In this case, the board has stated that the notebook pages in question were not "witnessed, signed or otherwise authenticated," and that the notebook itself apparently had not been seen by anyone other than Katz before the present controversy arose. However, I feel there is sufficient *circumstantial* evidence of record (Reese's May 28, 1969, letter to Katz; Roger's testimony concerning Katz's disclosure at the June 9, 1969, luncheon meeting; the forwarding of phosphoric acid samples to Ledoux for analysis) to substantiate the existence of the notebook as of the dates appearing in the record of Katz's experiments. Therefore, following the reasoning of *Berry* and *Ritter*, I consider the fact that the notebook was not witnessed to be of little consequence.

Moreover, we should be mindful of the fact that the invention in question, unlike that in *Berry*, is a process yielding no unique end product. Even a knowledgeable "over-the-shoulder" observer of an experiment during which the process was conducted would be hard-pressed to verify exactly how it was carried out (e. g., the amount of steel wool used or the actual concentration of the acid solution employed); consequently, his signature on an experimental record would hardly be determinative of the *accuracy* of the record. The absence of a third person's signature from the pages of Katz's notebook therefore should not be the basis for discounting the notebook as a factual account of Katz's experiments.

Finally, I conclude that any motivation conceivable for Katz to misrecord, either purposefully or inadvertently, the nature of his experiments in his personal notebook is far outweighed by the pressures inherent in his position as Reese's employee. Clearly, as an independent contractor hired by Reese to conduct investigations intended by Reese for commercial application, Katz would be strongly encouraged to accurately report his results, which Reese would have been expected to verify. The candid postmortem of the April/May 1969 experiments represented in the exchanges between Katz and Reese evidences a reality of their relationship—Katz could shade his results only at substantial risk of being discovered and having his employment terminated. Perhaps more importantly, Katz, who owned no share in URC, had little expectation in May 1969 of a proprietary interest in any commercial developments based on his work for Reese; accordingly, he was less subject to undue influence stemming from a strong personal desire to see the project succeed in a financial sense.

Therefore, absent evidence of a motivation for Katz to fabricate the contemporaneous reports of his experiments, the sufficiency of the notebook's contents *as corroborative evidence* should be assessed in light of the whole record. For the reasons set out in footnotes 9 and 10 of the majority opinion, I agree that appellant's evidence fails to demonstrate an actual reduction to practice. I therefore concur in the conclusion reached by the majority.

issue here is the exact date when, in late 1944, almost twenty-three years ago, Ritter conceived his invention. His notebook, a document of uncontested authenticity, is a contemporaneous record of his thoughts and actions. It is hard to imagine what more reliable corroborative evidence could be found. [Footnotes omitted.]